Matilda M. Brooks, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 63936.    Filed August 18, 1958.

*Herbert P. Moore, Jr., Esq.,* for the petitioner.
*Edward H. Boyle, Esq.,* for the respondent.

Tietjens, *Judge:* The Commissioner determined deficiencies in income tax of $473.10 and $509.70 for the years 1952 and 1953, respectively, and an increased deficiency of $669.90 for 1952 in an amended answer.

The questions for decision are (1) whether certain claimed deductions for travel and other expenses in connection with research activities were properly disallowed, and (2) whether a $1,000 payment received by petitioner from the University of California in 1952 was taxable as income.

FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by reference.

Petitioner lives in Berkeley, California. Her income tax returns for 1952 and 1953 were filed with the director of internal revenue for the first district of California in San Francisco, California.

At the time of the trial of this case petitioner was in her sixth decade. She is a scientist and received a Ph. D. degree from Radcliffe College in 1920. For 6 years thereafter she worked in the Hygiene Laboratory of the United States Public Health Service, 4 of those years as an assistant biologist and the last 2 years as an associate biologist. In connection with her research activities while with the Public Health Service and thereafter, petitioner published the results in a number of publications.

In 1927 petitioner's husband, Dr. Sumner C. Brooks, also a scientist, came to the University of California as a professor of zoology,

which position he held until his death in 1948. At the time of his appointment as a professor of zoology, Sumner received a letter dated June 1, 1927, from Dr. C. A. Kofoid, chairman of the department of zoology of the University of California, wherein Dr. Kofoid stated: "I hope you can convince Mrs. Brooks that she would have very full opportunity here for research. The facilities of the laboratory, insofar as they are at our disposal, would always be available for her."

Petitioner left the Public Health Service in 1926, and in 1927 accompanied her husband to the University of California where she was given an appointment as research associate in biology, without compensation. Petitioner served the university in that capacity until 1949 except for two intervals, one from October 17, 1934, to December 16, 1934, and the other from October 24, 1936, to June 30, 1937. During these intervals, her husband was on leave of absence without salary and she carried on his work, under an appointment as lecturer in zoology, receiving the salary released by his leave as follows: For 1934, $5,880; for 1936–1937, $3,472.

In 1949 petitioner was appointed research associate in physiology, without compensation. The "without compensation" aspect of the appointment was modified in 1952, as hereafter described.

During her connection with the University of California, petitioner performed valuable and important research and published her findings in regard thereto in many important scientific journals concerning such subjects, among others, as the cause and cure of air sickness, treatment for cyanide and carbon monoxide poisoning, the Crocker tumor, human reaction to altitude, and studies on growth and development of normal and abnormal forms in single cells as affected by changes in redox potential. Also, her scientific work has been recognized by her election to membership in such scholarly organizations as the Physiological Society; Phi Beta Kappa; Sigma Xi; listing of her name in American Men of Science; and radio dramatization of her work on March of Time and Ceilings Unlimited.

During the taxable years petitioner's primary research activities concerned studies on growth and development of normal and abnormal forms in single cells as affected by changes in redox potential. Certain single cells which she studied grow only in certain parts of the world and, in order to perform her research, she traveled in Europe during the greater part of 1952 and 1953. She expended $2,988 in 1952 and $3,685.20 in 1953 for her travel expenses to and from Europe, all of which expenses were incidental to her performance of research there.

Until the year 1952 the only sums of money received by petitioner from the university were in the form of research grants. In 1952

the university paid petitioner the gross amount of $1,749.96 and in 1953 the gross amount of $499.92. Minutes of various meetings of the regents of the University of California and various other official documents show the following information concerning such payments:

(a) Petitioner traveled to Peru in 1947 and 1948, in connection with which she claimed deductions for travel expenses in those years. These deductions were thereafter questioned by the Commissioner. She claimed the expenses were required by her research activities and that the expenses were legitimate business deductions. She had many discussions with representatives of the Commissioner from time to time concerning her 1947–1948 returns. The dispute was still unsolved in January of 1952, at which time she brought her tax problems to the attention of the regents of the university at a January meeting, suggesting to them that her designation as an "employee," even though without salary, rather than a "research assistant," would aid her tax status. The regents realized the impracticality of this suggestion, and indicated at their second meeting, after receiving the president's report on petitioner's services to the university and her record as a scientist, that they were inclined to reimburse petitioner for her possible income tax deficiencies.

(b) At a third meeting, held April 10, 1952, the regents voted in favor of reimbursing petitioner in an amount not to exceed $1,000 of her aggregate 1947–1948 proposed deficiencies, and requested the president to ascertain the exact amount thereof. In a letter dated May 6, 1952, the university controller recommended to the president that $1,000 be allowed to petitioner based on estimated total possible deficiencies of $850 to $900 for 1947–1948, and possible additional deficiencies for other past years, and in addition recommended petitioner's appointment, effective July 1, 1951, with an "annual stipend" of $500, until severance of her connection with the university, predicated on the assumption that petitioner's work was valuable to the university.

(c) At the meeting of May 23, 1952, the following budget transfer was made, without further comment, by the regents:

(1) From the Regents' Emergency Fund to:
(a) Miscellaneous Expense: Supplies and Expense    $1,000.00
    To cover tax deficiency disallowances on the 1947 and 1948 Federal Income Tax return of Dr. Matilda M. Brooks in accordance with the April 10, 1952 minutes * * *

On May 13, 1952, a request to issue a check to petitioner for $1,000 "to cover deficiency disallowances on 1947 and 1948 Federal Income Tax Returns" was approved by the president, and on June 16, 1952, a check in that amount was issued to petitioner.

(d) At the meeting of June 19, 1952, the following budget transfer was made, without further comment, by the regents:

(14) From * * * Searles Fund, to:
  (a) School of Medicine: Physiology: Searles Fund: $500.00

> *Salaries* To provide a stipend for Dr. Matilda M. Brooks to cover tax deficiency, disallowances of expenditures for research, on Federal Income Tax returns for 1951-52.   [Italics supplied.]

And, at an October meeting the following budget transfer was made:

(5) From * * * Searles Fund to:
  (a) School of Medicine: Physiology: Searles Fund: $500.00

> *Academic Salaries* To provide stipend * * * covering tax deficiency, disallowances of expenditures for research, on Federal Income Tax returns for 1952-53.   [Italics supplied.]

(e) Pursuant to aforesaid budget transfers, petitioner was appointed research associate "with salary" at the rate of $500 per annum for the period July 1, 1951, to June 30, 1952, and the period July 1, 1952, to June 30, 1953, which appointments provided, *inter alia:*

> Salary is subject to such deductions as may be required pursuant to applicable laws or regulations.
>
> In the event that my service does not continue throughout the year, the salary due me will be based upon the period of actual service, and I will return to the University such part of my salary as is not actually earned on this basis.

Similarly worded appointments at the same salary rate were made for July 1, 1953, to June 30, 1954, and all subsequent academic years, and the Records of Earnings of the University show the following W-2 information concerning petitioner:

| Year | Total wages | Tax withheld | Year | Total wages | Tax withheld |
|------|-------------|--------------|------|-------------|--------------|
| 1952 | $749.96 | $49.98 | 1955 | $499.92 | $90.00 |
| 1953 | 499.92 | 99.96 | 1956 | 499.92 | 00.00 |
| 1954 | 499.92 | 90.00 | | | |

During the years of her association with the university, petitioner received research support from other sources, such as the National Academy of Sciences; the American Academy of Arts and Sciences; the National Research Council; the University of California; the American Philosophical Society; the Ella Sachs Plotz Research Fund; and the Kappa Alpha Theta Fraternity.   Generally, the funds provided by these monetary research grants were expended on supplies, equipment, laboratory fees, salaries of laboratory assistants, and travel and living expenses, one of which travel and living expense grants provided for a trip to the South Seas to study cells found there. The monetary value of these various grants generally ranged from

$300 to $900, with the exception of the travel and living expense grants and the Kappa Alpha Theta grant, which was in the amount of $6,000. As the recipient of these monetary grants, petitioner had control of the research performed and the application of the funds, so long as the funds were applied on the particular research project. However, except to the extent that such grants provided for living expenses, petitioner received no direct economic benefit therefrom.

Except when she was working for the Public Health Service, except to the extent that research grants paid her living expenses, except to the extent that she received the benefit of her husband's salary from the university, except when she was substituting for her husband and earning his salary, and taking into account the $500 per annum stipend paid by the university, petitioner has made no net profit from her scientific activities. Because her husband's earnings provided a living for the two of them and because her research grants minimized her expenditures for research until her husband's death in 1948, petitioner did not have a strong, independent profit motive in regard to her research activities.

During the taxable years petitioner received and asked for no fellowships, grants, or salaries from any of these organizations. She was not studying for a higher degree or a new profession. She was continuing research of the same character with which she was occupied in former years. The university did not require her to travel during the taxable years. In those years she was not in the business or profession of seeking grants or fellowships. Neither was she engaged on her own account in the profession of performing scientific research for profit. She was, however, an employee of the university at an annual stipend of $500.

Petitioner's travel expenses in 1952 and 1953 were not ordinary and necessary expenses either in carrying on a trade or business or made in connection with her employment in the performance of services as an employee of the university.

Expenses of $33.59 in 1952 and $47 in 1953 were incurred in connection with her employment as a research associate of the University of California and are deductible.

The $1,000 paid her by the university in 1952 in order to reimburse her or pay for her income tax deficiencies in previous years has not been proved to be taxable income to petitioner.

## OPINION.

With respect to the travel expenses and certain small expenditures made for laboratory breakage and membership in professional societies, petitioner argues either that they were properly claimed as deductions for "ordinary and necessary expenses in carrying on a trade

or business" or paid for the production of income, or as necessary expenses paid in connection with her performance of services as an employee of the university.

The Commissioner has determined that the travel expenses are disallowable but he has also determined that some of the other claimed deductions are allowable as contributions to the university.

In deciding issues of this kind we recognize that the line to be drawn between personal expenses and business expenses is sometimes nebulous, and that that may be the case here. Nevertheless the sum and substance of the testimony and the documentary evidence is that petitioner for years has been a dedicated scientist carrying on scientific research which produced important discoveries, without, however, producing any net income. But we do not think she has established that in conducting her research she was ever doing so as a "trade or business" or that she was performing her research for "profit." True, certain of her discoveries were new to science and her papers thereon merited publication in scientific journals, but so far as we can ascertain from the record they were not the result of a profit motive or of anything more than a "hope" that they might obtain for her, sometime in the future, a grant or a fellowship or a salary status. They resulted from her curiosity, her desire to benefit mankind in whatever way she could, her innate drive as a "pure scientist" to find out as much as she could about her chosen field, all commendable in the highest sense, but in our opinion, without favorable tax consequences to petitioner. In the taxable years she admitted that she was not in the "business of applying for scholarships or anything" but maintained that by continuing her research activity she would be in "position to be either reimbursed or paid taxable income for her research activities." She testified she never received money or anything else of monetary value as a result of her trips to Europe in 1952 or 1953. The university did not require or even suggest that she take those trips or incur the expenses which she did and there is nothing in the evidence to establish that the expenditures were ordinary and necessary in connection with maintaining her status as a research associate. After her husband died she was hoping to "acquire some salary" because she was not certain that her own property together with what he left her would see her through. However, petitioner applied for no fellowships or grants in 1952 or 1953 and the only change in her salary status so far as the university is concerned came about as a result of her tax difficulties for previous years. The $500 annual stipend which she was allowed in 1952 and thereafter had no direct connection with the travel expense deductions claimed here and the record is such that we must sustain the Commissioner's determination.

We do think, however, that the laboratory breakage expenses and the professional society fees are directly connected with her status as a research associate at a $500 annual salary and that they are properly deductible.

With respect to the $1,000 which was paid petitioner in a lump sum in 1952 we hold that the Commissioner has not shown this was taxable income. The issue was affirmatively raised in an amended answer and the Commissioner has the burden of proof. So far as the record shows, the amount was paid the petitioner to help her in meeting deficiencies in income tax for prior years. The university was under no obligation to make this payment. Petitioner never asked for this sum, did nothing to earn it, and though the evidence does not clearly establish it as a gift, the Commissioner was bound to prove it was taxable income. In our opinion he has not done so and on this issue we hold for the petitioner.

*Decision will be entered under Rule 50.*