Harold H. Davis, and Estate of Geraldine H. Davis, Deceased, Harold H. Davis, Executor, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 85651.   Filed April 30, 1962.

*Paul L. Freese, Esq.*, for the petitioners.
*L. Justin Goldner, Esq.*, for the respondent.

OPINION.

FAY, *Judge:* The first question is whether the $2,016.19 expended by petitioner for the European trip in 1956 is deductible as an ordinary and necessary expense incurred in the pursuit of his trade or business under the provisions of section 162 of the Internal Revenue Code of 1954. The pertinent provisions of this section are set forth in the margin.[1]

Petitioner's principal argument in support of the deduction is that research and writing are a part of being a professor at a liberal arts college and that his trip and work in England were a natural outgrowth of this occupation. In addition, petitioner contends that the research and writing undertaken by him were necessary for the preservation and maintenance of his status as a professor at Pomona College. Petitioner does not contend that he is in the business of research or writing.

The question is one of fact and the burden is on the petitioner to show that the expense was both ordinary and necessary in the carrying on of his business as a professor. *Commissioner* v. *Heininger*, 320 U.S. 467 (1943); *Richard Seibold*, 31 T.C. 1017 (1959).

Our consideration and study of the facts in the record before us lead us to the conclusion that the first issue in this case should be governed by *Manoel Cardozo*, 17 T.C. 3 (1951). In the *Cardozo* case the taxpayer was an assistant professor of history and Romance languages at The Catholic University of America. During the summer months of 1947 he, at his own expense and for the purpose of research and study, made a trip to Europe. The taxpayer was not required by the authorities of the university, by the rules and regulations of the university, or by his contract of employment to make the trip. The taxpayer testified that the purpose of his trip was to increase his prestige, improve his reputation for scholarship and learning, and to better fit him to perform the duties for which he was employed. Under such circumstances, we held that the expenses of the trip were personal in nature and were not incurred to maintain the taxpayer's present position.

Similarly, we do not think that the petitioner here has satisfactorily established that engaging in research and writing was necessary to the continuance of his employment at Pomona College. The record discloses that petitioner as a full professor with permanent tenure was no longer subject to periodic reviews of his contract and unless he created some extremely difficult situation, he would remain a member of the faculty until he reached retirement age. In addition, peti-

---

[1] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

tioner admitted that he was not required by Pomona College to undertake his research project and that he was unaware of any faculty member at Pomona College who had ever been dropped for failure to do academic research.

It is urged, however, that a professor even after achieving permanent tenure was expected by Pomona College to continue his research and writing. This expectation was considered to be manifested by such things as the president's request prior to the preparation of his annual report for a report by the faculty with regard to the research and writing they had done during the year, the aid which the college gave for attendance at professional meetings where research problems were discussed and research papers were read, and, lastly, the interest of one's colleagues in his work. We believe such matters indicate nothing more than that the college expressed an interest in and, to a degree, encouraged the research and writing activities of its faculty.

It is also worthy of note that the petitioner during his tenure as a full professor between 1944 and 1959 produced only one article for publication, a fact which further tends to vitiate the petitioner's argument that the college required its professors to be engaged in continuous writing activity.

The cases of *Brooks* v. *Commissioner*, 274 F. 2d 96 (C.A. 9, 1960), reversing *Matilda M. Brooks*, 30 T.C. 1087 (1958); *Alexander Silverman*, 6 B.T.A. 1328 (1927); and *Hill* v. *Commissioner*, 181 F. 2d 906 (C.A. 4, 1950), reversing *Nora Payne Hill*, 13 T.C. 291 (1949), cited by the petitioner are distinguishable. In each of these cases the Court was able to find as a fact that the action of the petitioner giving rise to the expense was required or expected by his employer.

The record here does not warrant such a finding. The petitioner's research and writing activities were voluntary on his part and were undertaken for the purpose of study and to increase his prestige as a scholar. Expenditures made to acquire reputation and learning are not ordinary and necessary business expenses. *Manoel Cardozo*, *supra; Welch* v. *Helvering*, 290 U.S. 111 (1933). Our finding regarding the purpose of petitioner's trip makes it unnecessary to consider whether the cost of the trip is deductible as an education expense. Accordingly, we hold that the respondent's disallowance of the claimed deduction was proper.

The remaining issue concerns whether the petitioner is entitled to deductions in 1956 and 1957 for depreciation and expenses relating to a study maintained by him at his residence. Respondent disallowed the deductions on the ground that the study was merely for petitioner's personal convenience. The office facilities available to petitioner at Pomona College during 1956 and 1957 consisted of a

cubicle in a campus office building and, upon request, a cubicle in the new library building. Petitioner admitted that he was not required by Pomona College to do work at home and that the study was used, in part, in connection with his research project. When questioned about the facilities afforded him by Pomona College, petitioner stated that they were "not *quite* adequate in my own department at that particular time." (Emphasis added.)

We believe under such circumstances the petitioner has failed to establish that the expenses of maintaining his study were ordinary and necessary business expenses. It follows that petitioner is not entitled to deductions for depreciation or expenses relating to the maintenance of the study. Respondent is sustained on this issue as well.

Reviewed by the Court.

*Decision will be entered for the respondent.*

FISHER, *J.*, dissents.

SCOTT, *J.*, dissents as to Issue 1 only.

---

RAUM, *J.*, dissenting: 1. *European travel expenses.*—The conclusion of the majority is based upon so fundamental a misunderstanding of the scope of the applicable statute as to compel the expression of dissent. Section 162 grants a deduction of "all the ordinary and necessary" expenses paid or incurred in carrying on any trade or business. As will be pointed out more fully hereinafter, the word "necessary," as used in the statute, does not mean "indispensable" or "required." It has become firmly established that "necessary" was used by Congress as being synonymous with "appropriate"; and that if an expenditure is ordinary and appropriate to the taxpayer's trade or business and is reasonably or proximately related thereto it is deductible. Throughout the majority opinion there is undercurrent the erroneous notion that the deduction must be disallowed because the expenditure was not "required" by petitioner's employer, Pomona College, and that petitioner's tenure as a professor was not contingent upon performance of the research that gave rise to the expenditures. Thus, the Opinion states:

Similarly, we do not think that the petitioner here has satisfactorily established that engaging in research and writing was *necessary* to the continuance of his employment at Pomona College. The record discloses that petitioner as a full professor with *permanent tenure* was no longer subject to periodic reviews of his contract and unless he created some extremely difficult situation, he would remain a member of the faculty until he reached retirement age. In addition, petitioner admitted that he was *not required by Pomona College to undertake his research project and that he was unaware of any faculty member at Pomona College who had ever been dropped for failure to do academic research.* [Emphasis supplied.]

The quoted language is geared to a misconception of the statute. It is wholly beside the point that, by reason of having attained "permanent tenure," petitioner would not have been dismissed for failure to continue his research or that he was not "required" to undertake his project. The point in this connection is that, although there may not have been any contractual provision specifically so requiring, it was nevertheless the tradition at Pomona and commonly recognized expectation of Pomona that members of its faculty engage in research and writing in their respective areas of academic interest; and that in conforming to that tradition and expectation petitioner incurred the expenses which were reasonably related thereto. Considering the nature of petitioner's employment, such expenditures were ordinary; they were proximately related to his employment; and they were "appropriate" to the carrying on of his trade or business of being a professor of English. Certainly, they were "ordinary and necessary" expenses within the meaning of the statute.

Although the error of the majority in disallowing these expenses is based upon an erroneous understanding of the statute, a fuller statement of the facts will aid in bringing that error into sharper focus. The Court had the benefit of the testimony of three important witnesses: Professor Kemble, who had been chairman of the history department at Pomona; Professor Holmes of the English department at Pomona; and petitioner, who had been not only professor of English but also chairman of the English department at Pomona. Their testimony was fair and honest. As the trial judge who heard their testimony I was impressed by their reliability and by their obvious efforts to avoid overstating anything in petitioner's favor. Their testimony deserves credence, and there is no suggestion in the majority opinion to the contrary.

The record shows that on the national education scene there is, very generally, a recognized hierarchy of liberal arts colleges within the country; that colleges are ambitious to be recognized and to achieve a certain position or status with respect to other colleges; and that research, writing, and productivity of faculty members have a bearing on the efforts of a college to attain such status. The record also shows that when appointments are made to the faculty at Pomona, a teacher "is expected to have demonstrated ability to carry on independent research and to put that research into usable form in writing"; that such expectation is manifested not only in the consideration for employment but also in the consideration for the subsequent maintenance of the teacher on the faculty; and that it is, in fact, customary for research and writing to be done by members of the Pomona faculty. Indeed, the finding by the majority herein recognizes that at the end of a teacher's initial 2- or 3-year term, the continuation of his tenure "is based to a large degree on such factors as his teaching ability, *his*

*productivity, and his research and writing activity.*" (Emphasis supplied.) Clearly, Pomona College expected its teachers to engage in research and writing. Nor was such expectation limited to the junior members of the faculty, who had not yet attained "permanent tenure". Professor Kemble was questioned about reviewing appointments from the point of view of productivity of the teacher, and he testified as follows:

Q. Have you personally participated in reviewing qualifications of persons within the history department from this standpoint?

A. Yes. I have.

Q. And was consideration given, then, to the person's activity in the field of research and writing?

A. Yes, his ability was obviously considered, but fully as heavily his productivity and promise.

Q. Do you know if this same consideration is taken into account after a professor has achieved full tenure status with the university?

A. Yes, there is continuing interest in it. Obviously if a person has achieved tenure, it is no longer a prerequisite for continuation on the faculty, *but it can be a prerequisite for improvement in salary* and in an intangible way it is—it is very much in the mind of his colleagues and the president and his colleagues over them, the profession as a whole, as to whether he is carrying on *as would be expected in research and writing.* [Emphasis supplied.]

The point was further elaborated in Professor Kemble's cross-examination. He testified as to the continuing "interest" [1] of the college in a professor's research and writing as follows:

Q. After a person has obtained tenure, I believe you testified that there is a continuing interest in his research?

A. Yes.

Q. Could you tell the Court in what respect this interest is manifested?

A. It is manifested in the preparation of the president's annual report in which he requests the faculty to report the research and writing they have done during the past year.

It was manifested in the aid which the college gives in attendance at professional meetings where research problems are discussed and research papers are read.

It is manifested in an intangible way, I grant you, in the interest in one's colleagues, in his work, their questions to what he is doing, how he is getting along with things. If a faculty member constantly says, "I am not getting anything done, I am not accomplishing anything," this has, I think, a psychological effect of an unfortunate character.

Plainly, there were many subtle ways of putting pressure upon a teacher to continue his research and writing even after he had attained permanent tenure.

---

[1] The word "interest" must be understood in the context in which it was used, namely, as relating to the expectation of the college that its professors carry on the kind of work that was previously expected of them prior to their attaining permanent tenure. There should be no doubt whatever that such was its intended meaning; it was obviously not used in the sense of a casual regard or benevolent curiosity but rather in the sense of a real concern and expectation.

The thoughts expressed by Professor Kemble were confirmed by Professor Holmes, who testified as follows:

Q. Now, you have heard Doctor Kemble speak of the expectation at Pomona College with respect to the performance of research and writing by members of the faculty there. Are you familiar with such a custom or such an expectation at Pomona College?

A. Yes, I would agree with what Mr. Kemble said. I think *the college expects* that its faculty members would keep on studying and keep up research in fields of special interest, feeling, principally, I think, that this shows itself in the light and the depth of their teaching. But the college also, as Mr. Kemble pointed out, is competing with other colleges and wants to have a faculty that calls attention to itself by its scholarly activities. [Emphasis supplied.]

It is true also, as Mr. Kemble said, that there is nothing in our contracts that requires this. Pomona is a very civilized place. Nobody says, as a rule, "If you don't get a book out next year, find yourself another job." *But the pressures,* in other words, *are indirect rather than direct* as they are, say, at the big state universities where a department chairman tells a young man to get a book out next year or you are out, *but the pressures are still there.* [Emphasis supplied.]

Q. Would you say that there is a tradition at Pomona College of research and writing?

A. Certainly. It has a very good faculty and this is, as Mr. Kemble said, one of the measures by which a faculty is rated. I think—yes, it is a faculty that is notable for its publishing and its researching, I would think.

Q. You say by and largely these members have performed to such a tradition as an actual fact?

A. Yes.

I know of no reason why this testimony should not be accepted at face value, and none is suggested by the prevailing opinion.

Indeed, in the light of the foregoing, it may well be said that there was an implied "requirement" that petitioner engage in a program of research. The fact that he would not be dismissed for failure to comply with that requirement does not deprive it of its compulsive character. Other and perhaps more subtle means of enforcement were available; and, as Professor Holmes testified, the "pressures" were there. To be sure, the college did not require any *particular* program of research and was content to allow each professor a wide latitude of choice. Nor did it require of him that he travel to any particular place in carrying out his project. But this is of no consequence. Petitioner's trip was voluntary only in the limited sense that the college left it to each professor to select the ways and means that would most effectively enable him to carry out a program of research that was expected of him. It did expect him to "produce," and if the travel was reasonably related to his research, as it incontrovertibly was in this case, the expenditures were deductible. There is no dispute here that petitioner's trip to England was that of

a scholar engaging in serious research,[2] consulting manuscripts and other materials that were peculiarly pertinent to his special field of inquiry and were not available in the United States. The findings, showing a total expenditure of only $250.77 covering a period of some 6 weeks for his living expenses on this trip, emphatically negate the possible suggestion that this may have been a personal pleasure or sightseeing trip. Moreover, the fact that he hoped to attain distinction as a scholar from his labor or that he enjoyed his work is in no way inconsistent with the conclusion that he undertook the trip as part of a program of research that was expected of him by the college, and, in the circumstances, "required" of him.

As previously indicated, the majority opinion stresses the idea that petitioner had "permanent tenure," and that engaging in research and writing was not "necessary" to the continuance of his employment. Apart from the fact that the college had means (other than by threat of dismissal) of inducing a teacher to engage in the research expected of him, the thought implicit in the majority opinion is both cynical and astonishing. Professor Kemble, on cross-examination, when asked whether a person who had achieved tenure would ever be dropped if he failed to do academic research, replied: "I think not. It is an act of faith in the way the person is promoted."

Does the Court seriously suggest that there is no implied requirement or even expectation that petitioner engage in research because he could retain his job in spite of committing a breach of faith? Certainly, the Court recognizes such requirement or expectation in the case of a teacher who has not yet attained permanent tenure and who would be dropped for failure to engage in research. Obviously, when he is given permanent tenure the college has satisfied itself that the teacher can be relied upon to continue his research thereafter and expects him to do so. Indeed, it is a fair inference that the average professor is at or near the zenith of his productive career at that time, and it is unthinkable that the expectation of the college with respect to his research would in any way be diminished when it bestows permanent tenure upon him.

It is clear that petitioner carried out his program of research in accordance with the expectation and implied requirement of Pomona College. Accordingly, even upon the theory of the majority, this case must be decided the other way. But that theory itself is profoundly in error. For, there is no basis whatever in the statute (as it has long been construed) calling for the disallowance of expenses

---

[2] Of course, European trips during the vacation period may well be suspect, and expenses incurred in what is predominantly a pleasure or sightseeing excursion may not be deductible. See *Ralph E. Duncan,* 30 T.C. 386. But there is no basis in the record in the present case for concluding that petitioner's expenses were incurred for any purpose other than to carry out a program of serious research, and the majority opinion does not indicate otherwise.

that are "voluntarily" incurred. The statutory test is simply whether the expense is "ordinary and necessary," i.e., whether it is ordinary and *appropriate* in relation to the taxpayer's trade or business. The overwhelming majority of all expenses paid by American businessmen are incurred because in their best judgment such expenses are appropriate to the conduct of the business, not because they are under a legal obligation to make such expenditures. If the statute were to be construed so as to disallow expenses merely because they were "voluntarily" incurred,[3] the result would be catastrophic to the nation's business; I cannot conceive of any responsible court rendering any decision to that effect. And there is no basis in the statute for applying a different rule to teachers or the learned professions.

That the word "necessary" in the statutory term "ordinary and necessary" must be construed to mean "appropriate" or "helpful" rather than "indispensable" or "required" was clearly articulated some 28 years ago in *Blackmer* v. *Commissioner*, 70 F. 2d 255 (C.A. 2), and reflected an understanding of the statute that was not new at that time. The same understanding has persisted over the years. See 4 Mertens, Law of Federal Income Taxation, sec. 25.09.

In *Waring Products Corporation*, 27 T.C. 921, we said (p. 929):

We know of no requirement that there must be an underlying legal obligation to make an expenditure before it can qualify as an "ordinary and necessary" business expense under section 23 (a) (1), Internal Revenue Code of 1939. The basic question is whether, in all the circumstances, the expenditure is ordinary and appropriate to the conduct of the taxpayer's business. * * *

In a like vein the Court of Appeals for the First Circuit in *Commissioner* v. *Pacific Mills*, 207 F. 2d 177, affirming 17 T.C. 705, stated (207 F. 2d at 180–181):

An expense does not have to be absolutely essential in order to qualify as necessary. It is enough if an expense is incurred in consummating a transaction which is beneficial, that is, *appropriate and helpful*, to the taxpayer's business. The payment with which we are concerned clearly falls into this category. *In any event, the payment was thought by the taxpayer's officers to be beneficial, and we should be slow indeed,* even if we were inclined, which we are not, *to question the soundness of their judgment.* Welch v. Helvering, 1933, 290 U.S 111, 113, 54 S. Ct. 8, 78 L. Ed. 212. [Emphasis supplied.]

There is good precedent for the allowance of the deduction here in issue. In *Alexander Silverman*, 6 B.T.A. 1328, acq. VI–2 C.B. 6, decided some 35 years ago, a professor of chemistry was allowed deductions for expenses in attending scientific meetings and conventions as being related to the carrying on of his profession. The present

---

[3] Of course, certain voluntary expenditures may be so extraordinary in character as to fail to meet the statutory requirement that they be "ordinary." Cf. *Welch* v. *Helvering*, 290 U.S. 111. However, in the light of petitioner's occupation as a professor of English with special emphasis upon the Middle Ages and the coming of the Renaissance to England, the research conducted by him and expenditures incurred in connection therewith were patently "ordinary."

case is not fairly distinguishable. Taking into account the fact that the petitioner herein was a professor of English, that his special field was English of the Middle Ages, Chaucer, Spenser, and Shakespeare, with particular reference to the coming of the Renaissance to England, it was highly appropriate for him to travel to England in order to examine pertinent manuscripts and materials that were unavailable in the United States. Such study was appropriate not only in relation to the research that Pomona expected of him, but it was also of the type that would be helpful in the presentation of courses taught by him at Pomona.

To be sure, there have been other cases involving teachers and the learned professions in which the Government has taken a comparably narrow view, approved by this Court, but only to be reversed on appeal. See *Hill* v. *Commissioner*, 181 F. 2d 906 (C.A. 4), reversing 13 T.C. 291; *Marlor* v. *Commissioner*, 251 F. 2d 615 (C.A. 2), reversing 27 T.C. 624; *Brooks* v. *Commissioner*, 274 F. 2d 96 (C.A. 9), reversing 30 T.C. 1087; *Coughlin* v. *Commissioner*, 203 F. 2d 307 (C.A. 2), reversing 18 T.C. 528.[4] Indeed, in *Marlor* the reversal was per curiam! I think that the result reached in the prevailing opinion herein is equally erroneous, and that the claimed deduction should be allowed as an "ordinary and necessary" business expense under the statute.

2. *Expenses and depreciation of study.*—The same fundamental misconception of the statute that characterizes the majority's decision on the first issue is equally pervasive with respect to the deductibility of petitioner's expenses and depreciation of a study or office in which he did his work. Here, too, the insistent leitmotif appears, stressing the thought that petitioner was not "required" to maintain such a study or office. But this approach involves an erroneous understanding of the statute.

As pointed out above, the test is not whether the expenditure is "required," but rather whether it is "appropriate" or "helpful" and proximately related to the taxpayer's trade or business. Of course, where the taxpayer is compelled by his employer to incur certain expenses, that fact itself may be highly pertinent in allowing the deduction. But the absence of such compulsion certainly does not, of itself, require the opposite result. The question still remains whether the expenditure is reasonably related to the taxpayer's trade or business. A review of the facts developed in the record before us should leave no doubt on this score.

[4] *Manoel Cardozo*, 17 T.C. 3, relied upon so heavily by the majority herein, was not appealed. Moreover, whatever view one may take of that decision, it is distinguishable. There was no finding in that case that the university expected its faculty members, particularly those who had already attained highest rank, to engage in research. The evidence in the present case is overwhelming that Pomona had such expectation, and a failure to make a finding in accordance therewith would be plain error.

The record shows that petitioner had constructed a room over a garage adjacent to his residence as a study or office at a cost of $5,000. He used it in preparing lectures, reading examination papers, holding student conferences, storing materials, and doing research in connection with his project which was discussed above. There is no suggestion that the study was used by anyone other than petitioner and there is no finding that it was used for any purpose unconnected with his work. On his returns for 1956 and 1957 he claimed a deduction of $250 for depreciation and $40 for utilities. The amount of the deduction is not in issue if it be held that petitioner is entitled to any deduction in this respect.

At the outset, it is important to lay at rest any possible argument that petitioner's right to deduction must be denied because he was an employee rather than one who was self-employed. There is nothing in the law establishing any such distinction. If the expenses are "ordinary and necessary," proximately related to the taxpayer's work, they are deductible.

A controversy has arisen between the parties as to whether the college provided petitioner with an office or study. But even if it did, that fact would not necessarily preclude the deduction. The question would still remain whether it was "appropriate" or "helpful" to the taxpayer in his trade or business to maintain the particular study in question. Persons in various lines of endeavor often maintain offices at their residences, and it has been the Government's practice to allow deductions with respect thereto, provided, of course, that there has been a bona fide use of such facilities in the taxpayer's trade or business. And even when such an office has served both a personal and business use, it has been customary to make an allocation under the familiar *Cohan* rule so that deduction might be allowed for the portion properly attributable to business use. No such latter problem is present here, for the study, or office in question was used by petitioner exclusively for his work.

Recurring to the statutory test, it is clear that petitioner's office or study was "necessary," i.e., appropriate, in carrying on his profession as a teacher at Pomona, regardless of whether the college supplied him with an office on its grounds. For what could be more appropriate or "ordinary" for a professor than to maintain a study in or near his home where he prepares lectures, corrects examinations, and performs a multitude of other tasks directly related to his work? It must be remembered that the time spent in the classroom or lecture hall is only a fraction of the entire time required of a professor to discharge all his duties. Nor is it common to have any fixed working hours for such additional work. The very character of that work and the flexibility of the time required for it make it most appropriate and "ordinary" for a professor to have a study at his home. That the

maintenance of such study may perhaps be characterized as being for his "convenience" is not at the same time inconsistent with its proximate relationship to his work. Accordingly, even if the college provided petitioner with a private office the maintenance of his study would still qualify for deduction.

However, petitioner's case is stronger. The facilities provided by the college were, on this record, inadequate and could not fairly be characterized as a private office. They consisted merely of a cubicle in a large room shared with some five other professors. Privacy was lacking, and conditions for contemplative work as well as the conduct of conferences were hardly ideal in such circumstances.[5] I would hold that petitioner is entitled to the deduction claimed.

BRUCE, FORRESTER, and TRAIN, *JJ.*, agree with this dissent.

---

[5] The majority's reference to petitioner's testimony that the facilities afforded him by the college were "not *quite* adequate in my own department at that particular time" (emphasis in majority opinion), simply takes advantage of petitioner's modest manner of understatement that was all too apparent to one observing him at the trial.