MURRAY R. DENEMARK and FLORENCE DENEMARK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Denemark v. Commissioner
Docket No. 6165-73.
United States Tax Court
T.C. Memo 1976-267; 1976 Tax Ct. Memo LEXIS 134; 35 T.C.M. (CCH) 1170; T.C.M. (RIA) 760267; August 23, 1976, Filed Lawrence Silver for the petitioners. Gerald V. May, Jr. for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined *135 a $2,308.93 deficiency in petitioners' income tax for 1969. The issues presented for decision are as follows: 1. Was petitioner Murray R. Denemark a shareholder in Atlantic Coast Textile, Inc.? On this question the following issues depend: (a) Whether petitioner must recapture investment credit which flowed through to him from Atlantic Coast Textile, Inc. (b) Whether petitioner overstated his income in reporting undistributed subchapter S dividends, and therefore received no tax benefit from the investment credit. 2. Whether petitioner had an overpayment of tax for 1969 and 1970 as a result of being entitled to a business expense deduction, a business loss or a theft loss.
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners resided in Jericho, New York when they filed their petition. Florence Denemark is a petitioner solely by having filed a joint return with her husband. We will hereafter refer to Murray Denemark as petitioner. Petitioner graduated from the Philadelphia Textile Institute in 1954 with a Bachelor of Science degree in textile engineering, specializing in knit goods technology. In 1958, after serving in the United *136 States Navy, [1] petitioner began work with a Brooklyn, New York, textile mill as the assistant production manager at $125 per week. The job was designed to expose him to various mill functions, including the scheduling of machine operations and the coordinating of colors and patterns. Petitioner subsequently was employed in the Pennsylvania towns of Schuylkill Haven, Pottstown, and Allentown. Each change led to a more responsible position involving the production of textile fabrics. In the fall of 1964, petitioner was working for Fab Knit Mills, Inc., Allentown, Pennsylvania, as a plant superintendent, earning $18,000 a year. Petitioner was 31 years old in 1964, and he desired to go into business for himself. While petitioner had the expertise to operate a mill, he lacked the necessary capital to do so. Early in 1965 Stanley Young, a social acquaintance of petitioner's, indicated that he, Max Langfelder, Martin Hirsch, and William Langfelder were interested in investing in a milling operation. They offered *137 petitioner the following proposition: petitioner was to establish a textile contracting business, sometimes called a commission business, for the flame foam bonding and contract knitting of fabric; in return, petitioner would receive an employment contract providing for a salary of $225 per week and the opportunity to acquire a 20 percent interest in the business. In early 1965, pursuant to the above arrangement, Atlantic Coast Mills, Inc. ("Mills") and Atlantic Coast Textile, Inc. ("Textile") were incorporated in Pennsylvania and located in Schuylkill Haven, Pennsylvania. Mills was to be a leasing corporation, and Textile was to be the operating corporation. Mills was organized with paid-in capital of $10,000, represented by 100 shares of $1 par value common stock. [2] Each of the five shareholders, Max Langfelder, William Langfelder, Stanley Young, Martin Hirsch and petitioner acquired 20 shares. Petitioner did not have $2,000 to pay for his 20 percent interest in Mills' stock. As a result, Max Langfelder loaned him $2,000 which petitioner deposited in his personal account; petitioner then wrote a check to Mills for the $2,000. Petitioner never received a stock certificate *138 from Mills. Textile was organized on April 27, 1965 with capital of $5,000, represented by 100 shares of common stock without par value. About four months after Mills was incorporated, Textile was formed when it was decided that Mills would be used as a leasing corporation and Textile would be the operating company. On May 18, 1965, petitioner, Max Langfelder, Stanley Young, William Langfelder, and Martin Hirsch, each as 20 percent consenting shareholders, filed Form 2553, "Election by Small Business Corporation", for Textile, thereby electing subchapter S treatment. Stanley Young reviewed the basic tax consequences of operating Textile as a subchapter S corporation with petitioner prior to petitioner's signing the shareholder consent accompanying the Form 2553. However, petitioner did not understand all the tax ramifications of the subchapter S election. The planned capital investment in Textile amounted to $5,000. Apparently Textile operated with outstanding unpaid subscriptions for stock of $1,000 apiece from each shareholder. Mills, in 1965, proceeded to purchase land and buildings for $279,000 *139 and equipment for $275,000. The acquisitions were made possible with loans from banks, using the property and machinery as collateral, and with loans from officers and shareholders. During the years 1965 through 1968, Mills held title to the building, machinery and equipment. Textile, during this same period, served as operator of the business and lessee of the building, machinery, and equipment. Mills waived its right to any investment credit to allow Textile to claim and receive the full credit. Pursuant to the original offer made to him, petitioner became president of both corporations with the responsibilities of running the factory, hiring labor, and soliciting business. He also provided technical expertise. Neither this job nor any of petitioner's earlier jobs involved extensive participation in the financial aspects of the business. While the other shareholders occasionally helped in the day to day operations of the business, their assistance was minimal. Petitioner's fellow shareholders had been using a certified public accountant named Morton Brand ("Brand") in connection with their other businesses. At their suggestion, Brand was retained to do work for Mills *140 and Textile. From 1965 through 1968, Brand prepared the income tax returns for both corporations. Brand also prepared petitioner's joint income tax returns for 1965 through 1970. For the taxable years 1965 through 1968, petitioner included his share of the undistributed subchapter S profit of Textile in income and claimed the benefit of his share of Textile's investment credit as follows: Year
Share of Subchapter
Share of Subchapter
S Profits
S Investment Credit
1965
$ 2,399.34
$ 932.00
1966
4,212.53
1,077.17
1967
3,162.43
224.95
1968
5,882.53
74.80
$15,656.83
$2,308.93 Petitioner never questioned the inclusion in his income of his share of the undistributed subchapter S income, or application of his share of the investment credit against his tax liability. In addition to reporting his share of undistributed subchapter S profits, petitioner reported salary of approximately $12,000 per year from Mills and Textile. Petitioner participated in some informal meetings of the five owners of Mills and Textile, particularly those involving purchase of machinery. During the spring of 1969, negotiations were initiated to sell Mills and Textile *141 to the Acadia Company, Inc. ("Acadia"), one of Textile's principal customers. Petitioner was in favor of the sale because he felt the business had grown too large for him to handle well. However, petitioner did not participate in the negotiations with Acadia. Negotiations began with an apparent agreed overall price of $155,000. Perhaps in response to Acadia's claim that it had been overcharged for some defective materials, the purchase price was later reduced. On or about June 29, 1969, the shareholders of Mills and Textile agreed to sell their capital stock to Acadia for a total sales price of $145,000, $90,000 to be paid at settlement, and the $55,000 balance evidenced by non-negotiable promissory notes, to be paid over three years. The sales agreement provided that the sales price included payment of all loans and advances made by the shareholders to the corporations. Pursuant to that provision, the stockholders executed an Assignment of Loan Receivable. The agreement also provided for the resignation of all directors, officers and employees. Acadia, Mills, Textile, and the five shareholders entered into a Supplement, dated June 26, 1969, which provided that sales *142 proceeds were to be divided as follows: Mills, $78,239.65; Textile, $66,760.35. On June 26, 1969, petitioner and the other four sellers executed a Declaration of Trust whereby the proceeds of the sale were turned over to Brand, as trustee, for collection and distribution in such manner as a majority of the individual beneficiaries should direct. A letter of authorization was executed by the five shareholders authorizing Acadia to render payment of all sums due them to Brand without responsibility of Acadia to see to the application of the sums so delivered. Petitioner's fellow shareholders took the position that petitioner was responsible for shortages, errors, and credits claimed by Acadia. As a result, they charged his share of the sales proceeds with those amounts. Petitioner had never been advised that he would be held personally responsible for any chargebacks. Brand distributed $88,520 of the proceeds from the $90,000 check as follows: Deposits
Payees
Cash Deposited
$90,000
To: Petitioner
$ 2,000
Langley Properties
5,000 [3]
Max Langfelder
43,465
Martin Hirsch
12,485
Stanley Young
12,785
William Langfelder
12,785
TOTAL
$90,000
$88,520
*143 The $2,000 payment which petitioner received on July 9, 1969, was used by petitioner to repay his debt to Max Langfelder. Payments on the $55,000 note commenced on October 9, 1969 and ran through April 28, 1972. Those proceeds plus the theretofore undistributed remainder of the $90,000 were distributed as follows: Installment Notes and
Interest Deposited
$58,505.68
To: Petitioner
$ 2,079.05
Attorneys: Houck, Bohared,
Lipkin, Russell
1,571.40
Property Tax 1969
250.00
Freyer & Taub
350.00
Max Langfelder
13,900.00
Martin Hirsch
13,900.00
Stanley Young
13,900.00
William Langfelder
13,900.00
TOTAL
$58,505.68
$59,850.45
The total withdrawals from the sales proceeds were $148,370.45, leaving $135.23 in the bank. [4]
*144 Petitioner's 1969 return did not reflect any gain or loss on the disposition of the Mills shares. However, it did reflect the sale of Textile stock. Petitioner's share of Textile proceeds was noted on his 1969 return as $12,896, which, when figured against a basis of $17,989.54, led to a capital loss of $5,093.54. Petitioner took the maximum $1,000 capital loss deduction on his return. On August 18, 1970, when petitioner received $2,079.05 from the note proceeds, he executed a release discharging his fellow shareholders, Brand, and Langley Properties from any and all liability, past, present, or future, due to any cause, with particular reference to the stock sales agreement and the Declaration of Trust. Petitioner accepted the $2,079.05 believing that it represented the balance of the amount he was owed from the stock sale, except for perhaps a few additional dollars of interest. Not until 1975, when he started reviewing both the stipulation of facts and information received from the revenue agent in the course of preparing for this trial, did petitioner realize that he had any claim to additional funds from the sales proceeds. Mills was entitled to an investment credit *145 on property it purchased. It allowed the credit to flow through to Textile. The sale of capital stock of Mills and Textile occurred before the end of the useful life of the property that gave rise to the investment credit, and such sale constituted an early disposition of section 38 property. OPINION Petitioner's various arguments are less than clearly stated. His basic argument, however, is that he was never a shareholder in Atlantic Coast Textile, Inc. As a result, petitioner claims that Textile is not a qualified subchapter S corporation and he is not a shareholder of a subchapter S corporation. Although petitioner claimed an investment credit which flowed through Textile to him, he also reported undistributed subchapter S dividends, and since the tax attributable to the dividends exceeded the investment credit, petitioner claims he received no tax benefit from the investment credit. The short answer to all these claims is that we conclude that petitioner was a shareholder in Textile. Petitioner left employment with Fab Knit Mills, Inc. in 1964 to join forces with four others as owners of a milling operation. Petitioner testified that he was no longer interested in working *146 solely as an employee, but instead wanted a proprietary share of a business. Pursuant to the arrangement with his business associates, petitioner, in exchange for his expertise, services, and cash, was to receive a 20 percent interest in the entire business plus a weekly salary. The weekly salary compensated him for his work as the primary employee of the business.
Two corporations were formed. The first corporation, Mills, was to purchase land, buildings and equipment and lease it to the second corporation, Textile. Textile was to use the building and equipment in operating the business. Pursuant to the agreement to give petitioner a 20 percent interest in the business, he advanced $2,000 as his capital contribution to Mills. Petitioner never received a stock certificate evidencing his shareholder status with Mills. Nonetheless he does not contest his status as a shareholder with Mills. As for Textile, numerous facts in the record demonstrate that petitioner was also a Textile shareholder. On May 18, 1965, petitioner joined with his fellow shareholders in filing Form 2553, with appropriate consents, electing that Textile be treated as a subchapter S corporation. Respondent *147 accepted the election and has never questioned it. The Form 2553 indicated that petitioner owned 20 shares in Textile. It is fair to infer that petitioner's signed consent suggests that he considered himself the owner of the 20 shares. Prior to that election, Stanley Young, one of petitioner's business associates, explained the implications of subchapter S status to petitioner. While petitioner may not have been thoroughly aware of every tax ramification of subchapter S status, he nevertheless understood that he signed the election as a Textile shareholder. Textile's income tax returns for 1966 through 1968 also indicate that petitioner owned 20 shares of Textile. Petitioner's personal income tax returns reflect that he was including in his income Textile's undistributed subchapter S profits and that he was also including his allocable share of Textile's investment credit which was passed through to its shareholders. During the years he filed those returns, he never questioned inclusion of the income or utilization of the tax credit. On June 29, 1969, the five shareholders decided to sell their stock in both corporations to Acadia. The various documents of sale signed by petitioner *148 indicated he was a 20 percent shareholder of both corporations. Furthermore, in conjunction with the sale of the stock, petitioner as a shareholder-seller executed a Deed of Trust, transferring the proceeds of sale to Brand in trust. While admittedly acting as a shareholder from 1965 through 1969, petitioner now seeks to disavow that shareholder status by alleging that, since he failed to make a capital contribution to Textile, he never became a shareholder. On the facts before us, we conclude that petitioner's failure to make an actual cash capital contribution to Textile does not vitiate his explicit acceptance of shareholder status. Two corporations were formed pursuant to the business arrangement. After Mills' incorporation and prior to Textile's, petitioner and his fellow shareholders were, in effect, subscribers to Textile stock. Pa. Stat. Ann. tit. 15, § 1002(18) (1967). While as a subscriber for Textile shares, actual payment for that interest would be expected, the record does not indicate that a specific date was ever established for payment of the subscribed shares. Textile was incorporated on April 27, 1965. Petitioner as a subscriber became a Textile shareholder *149 as of that date. Pa. Stat. Ann. tit. 15, § 1207 (1967); see Keystone Wrapping Machine Co. v. Bromeier,42 Pa. Super. 384, 387 (Super. Ct.) (1910); Bachman v. Dr. M. L. Errerick Laboratories, Inc., an unreported case (46 Lanc. L. Rev. 546, 549 (Com. Pleas. Lancaster Co., 1939)); John J. Reddy,66 T.C. 335 (1976); Thos. E. Bone,52 T.C. 913, 920 (1969). As with Mills, petitioner did not receive a certificate representing shares of stock owned in Textile. But it is not essential that a certificate of stock be issued in order to create shareholder status. Pa. Stat. Ann. tit. 15, § 1607(D) (by implication), § 1002(15) (as restricted by the opening sentence of that section), § 1207 (by implication); Keystone Wrapping Machine Co. v. Bromeier,supra;Bachman v. Dr. M. L. Errerick Laboratories, Inc.,supra; 2 W. Edward Sell, Pennsylvania Business Corporations (1969), sec. 604.1, pp. 1-2; sec. 605.1, p. 4; sec. 607.7, p. 6 [hereinafter cited as Sell]. Further, since the shares were not fully paid, it was consistent with Pennsylvania law not to issue the certificates *150 at this juncture. Pa. Stat. Ann. tit. 15, § 1607(D) (1969). At the time of Textile's incorporation, petitioner was an outstanding shareholder with 20 shares, whose stock interest was unpaid. [5] That liability remained unpaid during Textile's existence. There is no evidence in the record that the corporation ever called for payment of that liability. Pa. Stat. Ann. tit. 15, §§ 1604, 1605 (1969). In addition, under Pennsylvania law, a shareholder does not forfeit his status as shareholder despite nonpayment of his subscription and remains liable to the corporation or to the corporation's creditors in the event of the corporation's insolvency. Pa. Stat. Ann. tit. 15, §§ 1605, 1609; see Harr v. Mikalarias,328 Pa. 49, 195 A. 86, 89 (1937); Cook v. Carpenter,212 Pa. 165, 61 Atl. 799 (1905); Swearingen v. Sewickley Dairy Co.,198 Pa. 68, 78, 47 Atl. 941, 942-943 (1901); Burt v. Real Estate Exchange of Philadelphia,175 Pa. 619, 34 Atl. 923 (1896); Curry v. Scott,54 Pa. 270, 276 (1867); *151 Sell, supra, sec. 609.8, pp. 7-8; sec. 609.9, pp. 8-9. Furthermore, petitioner has not shown that any of the other shareholders contributed any capital to Textile, yet petitioner argues he is somehow not a shareholder while they are. We conclude that petitioner was a shareholder of Textile from its incorporation until the sale of its stock. Since petitioner was a shareholder, he was qualified to join in the subchapter S election for Textile, and that election was valid.
The parties agree that Mills was entitled to the investment credit and that it was properly allowed to flow to Textile. They further agree that the sale of capital stock in Mills and Textile occurred before the close of the useful life of property with respect to which the investment credit was allowed and therefore constitutes an early disposition of section 38 property, causing investment credit *152 recapture under section 47(a) (1). Since we have found petitioner to be a qualifying Textile shareholder, which in turn validates the Textile subchapter S election, petitioner is required to recapture his proportionate share of the investment credit. See sections 48(e) and 47(a)(1); section 1.47-4, Income Tax Regs; Estate of C. A. Diecks,65 T.C. 117, 125-126 (1975). Petitioner also argued that, since he was not a Textile shareholder, he improperly included the corporation's undistributed profit in income. He added that, since he applied his share of the investment credit against tax liability for income he improperly included, he actually derived no tax benefit from the investment credit and should not be required to recapture it in 1969. But, as noted above, he was a qualifying Textile shareholder and therefore properly included as taxable income his allocable share of undistributed subchapter S profits. Section 1373. As a result, his tax benefit argument fails. In addition to contesting the merits of respondent's proposed deficiency (related to recapture of investment income), petitioner seeks determination of any overpayment *153 for 1969 and 1970 by reason of a business expense deduction, a business loss, or a theft loss. Petitioner was the chief executive officer of Textile. As such he operated the mill and was responsible for the work produced. When the shareholders of Textile (including petitioner) sold their stock in Mills and Textile to Acadia, a principal customer of Textile, Acadia demanded that the purchase price be reduced because of its claims against Textile for shortages, errors and chargebacks. Unknown to petitioner, the four other shareholders charged petitioner, as principal operating officer, with the alleged shortages, errors, and chargebacks claimed by Acadia. This determination was made at the time the sales price for Mills' and Textile's stock was determined and was communicated to Brand, trustee of the sales proceeds. Brand, with this knowledge, made out petitioner's 1969 tax return wherein Brand reported the sale of Textile stock as a completed transaction as follows: Date Acquired
Date Sold
Gross Sales Price
Basis
Loss
3/11/65
7/9/69
$12,896
$17,989.54
($5,093.54) Respondent does not take issue with this reporting. Petitioner, however, received *154 only $2,000 sales proceeds in 1969. Brand did not report the sale of Mills in 1969. We presume that the $55,000 note, which Brand testified he did not consider includable in income in 1969, must have been attributed to the sale of Mills. Unfortunately, petitioner's 1970 return is not included in the evidence in this case. The record does not disclose whether the sale of Mills is recorded thereon. However, petitioner received his last payment in connection with the sale of stock in 1970 when he received $2,079.05 and signed a release of any further interest in the proceeds of sale. We may assume the sale of Mills would have been reported in 1970, on the basis of Brand's theory. Shareholders Stanley Young and William Langfelder received $13,785 in 1969 and shareholder Martin Hirsch received $13,485. Shareholder Max Langfelder received $44,465, part representing repayment of loans. Petitioner, as noted, received $2,000. We conclude that Brand attributed to petitioner the total part of the sales proceeds of Textile to which petitioner was entitled on petitioner's 1969 return. The difference between the sales proceeds ($12,896) and the amount paid him ($2,000) represents *155 the chargebacks attributable to petitioner in 1969. In other words, petitioner was treated as having been paid $12,896 for his Textile stock (which he reported) and having paid to Brand through set-off (for distribution to the other shareholders) $10,896 on account of his allegedly poor performance as executive officer of Textile which resulted in shortages, errors, and chargebacks. This amount was attributable to his performance as an employee, and therefore is deductible as an ordinary business deduction in 1969. Matilda M. Brooks,30 T.C. 1087, 1093 (1958) (breakage of laboratory glass), revd. on other issues 274 F. 2d 96 (9th Cir. 1959); cf. Rev. Rul. 69-214, 1969-1 C.B. 52. [6]
Petitioner presumably reported the sale of Mills in 1970 and may have sustained further capital and ordinary losses in that year. However, 1970 is not before us. The Tax Court cannot consider an overpayment for a year other than that covered *156 by a statutory notice of deficiency (here only 1969). Section 6214(a) and (b); see Alvin B. Lowe,44 T.C. 363, 372-373 (1965); Estate of Samuel Stein,40 T.C. 275, 277 (1963); Loyd L. Parker,37 T.C. 331, 332 (1961). Having decided that petitioner is entitled to a business expense deduction for the shortages, errors and chargebacks attributed to him, we need not consider his alternative positions that he is entitled to a business or theft loss. Decision will be entered under Rule 155. Footnotes
1. Petitioner was a supply officer in the Navy. He attended Naval Supply School in Athens, Georgia, and then served 18 months as supply officer on a destroyer.↩
2. The precise date of incorporation does not appear in the record.↩
3. The $5,000 payment to Langley Properties, a partnership in which Max Langfelder, Stanley Young and William Langfelder were partners, was repayment of an earlier partnership loan to Mills.↩
4. Brand distributed the following amounts to the following persons during 1969 through 1972 (the difference in the total of these figures, taken from the checks written on the trust fund, and the stipulated figures of payments out of the $90,000 cash payment and the $55,000 note, is not explained): ↩
1969
Petitioner
$ 2,000.00
Langley Properties
5,000.00
Max Langfelder
45,465.00
Martin Hirsch
13,485.00
Stanley Young
13,785.00
William Langfelder
13,785.00
Attorneys: Houch, Bohared,
Lipkin, Russell
1,571.40
Property Tax, 1969
250.00
TOTAL
$ 95,341.40
1970
Petitioner
$ 2,079.05
Freyer & Taub
350.00
Max Langfelder
4,900.00
Martin Hirsch
4,900.00
Stanley Young
4,900.00
William Langfelder
4,900.00
TOTAL
$ 22,029.05
1971
Max Langfelder
$ 5,175.00
Martin Hirsch
5,175.00
Stanley Young
5,175.00
William Langfelder
5,175.00
TOTAL
$ 20,700.00
1972
Max Langfelder
$ 2,825.00
Martin Hirsch
2,825.00
Stanley Young
2,825.00
William Langfelder
2,825.00
TOTAL
$ 11,300.00
$149,370.45
5. Textile's balance sheet shortly after incorporation indicates a $5,000 advance to its shareholders. The only apparent explanation is that each shareholder's $1,000 capital contribution was still outstanding. That outstanding loan to its shareholders remained on the balance sheet through each successive year.↩
6. Marshall J. Hammons,12 T.C.M. 1318↩, 22 P-H Memo. T.C. par. 53,368 (1953) (shortages on bakery truck).