GEORGES SIMENON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 86040. Filed September 29, 1965.

---

*Richard R. Schilling, Jr.*, for the petitioner.
*Charles M. Greenspan*, for the respondent.

HARRON, *Judge:* The respondent determined a deficiency in income tax for the taxable year 1955 in the amount of $22,895.57. The main question is whether petitioner had a "permanent establishment" in the United States until March 19, 1955, within the meaning of the income tax convention between the United States and France and respondent's regulations adopted thereunder, with the consequence that author's royalties from U.S. sources received while he was in France are not tax exempt.

#### FINDINGS OF FACT

The stipulated facts are so found and are incorporated herein by reference.

Petitioner is now a resident of Switzerland. He was an alien resident of the United States from January 1 through March 19, 1955, and before 1955. He filed a return, Form 1040, which is an individual income tax return, sec. 6013(a)(1), 1954 Code. On the return, petitioner stated that it was for a short period (other than the calendar year 1955) beginning January 1, 1955, and ending March 19, 1955. The return was filed with the director of international operations of the Internal Revenue Service in Paris, France (office of the Treasury representative for taxation), on April 30, 1957. Although the return was delinquent, reasonable cause was established and the respondent did not assert a delinquency penalty.

Beginning March 28, 1955, through November 29, 1955, concerns in the United States (U.S. sources) paid petitioner royalties, as consideration for the right to use copyrights and analogous rights with respect to literary works of the petitioner, in the total sum of $25,291.95, as follows, none of which was included in gross income in the return for 1955 filed by petitioner:

| Date paid in 1955 | Payor | Amount |
| --- | --- | --- |
| Mar. 28 | Doubleday & Co | $5,000.00 |
| May 4 | New American Library | 113.75 |
| July 5 | 20th Century Fox | 20,000.00 |
| Nov. 29 | Appleton | 178.20 |
| | | 25,291.95 |

The respondent determined that all of the above income from royalties is includable in petitioner's gross income for 1955 and taxable. In the statutory notice of deficiency, he gave the following reason: "Royalty income received from sources within the United States for the period March 28, 1955 to December 31, 1955 is taxable since you engaged in trade or business through a permanent establishment in the United States during part of the year."

Petitioner's return for 1955 was prepared on a cash basis.

Petitioner, as an alien resident of the United States, filed income tax returns for the calendar years 1951, 1952, 1953, and 1954, at least.

Petitioner reports income on the basis of a calendar year. There is no evidence to the contrary.

Petitioner is, and at all times has been, a citizen of Belgium where he was born. His wife, Denyse (also known as Denise), is a citizen of Belgium. Petitioner's family consists of his wife and three children.

Petitioner is a professional writer of fiction, an eminent author. He writes in French. He is by experience and practice a European novelist. He writes psychological and mystery novels and stories. In his mystery stories, the principal character is Inspector Maigret. All of his literary works, except six, have a European background. His literary works have been published in various countries, including the United States, Canada, and Great Britain, and many have been translated into the English language.

Prior to 1946, petitioner lived in several countries in Europe and in England for varying periods of time. In 1946, he lived in Canada until September, and in the United States during September through December, under a visitor's visa. He entered the United States from Cuba under a permanent visa in February 1947, and thereafter he continued living in the United States as an alien resident through March 19, 1955, except for occasional trips of short duration to European countries.

Beginning on July 27, 1950, petitioner rented residential property, called Shadow Rock Farm, in Lakeville, Conn., where he lived with his family until March 19, 1955. On November 1, 1950, he purchased this property. The purchase price plus improvements was $55,000.

While residing in the United States, petitioner wrote 46 books, novels, and short stories, all of which were written in French and have French titles. All have European backgrounds and are based on experiences and knowledge which petitioner had acquired in Europe, except six books of novels and stories in which petitioner made use of knowledge acquired in the United States. Prior to 1955, petitioner's main publishers in the United States were Prentice-Hall, Inc., and Doubleday & Co. During 1955, Doubleday was his exclusive publisher.

In about 1955, petitioner decided to go to Europe. He believed that he could carry on his creative writing better in a European background. He departed from the United States, with his family, on March 19, 1955, and went directly to France, where he remained until June 20, 1956. He then went to Switzerland where he and his family have lived continuously ever since. He has not returned to the United States at any time.

Prior to March 19, 1955, petitioner instructed his lawyer and real estate agent in Connecticut to offer the property called Shadow Rock Farm for sale. All of the furniture in the house was sold at an auction in the summer of 1955. The property apparently was unoccupied until December 1957, when it was rented, and thereafter it continued to be rented until it was sold on July 15, 1963.

Upon his arrival in France in March 1955, after a short stop in Paris, petitioner and his family went to the southern part of France where they lived in rented quarters from March 30, 1955, until June 20, 1956, in or near Cannes. They lived at the Miramar Hotel in Cannes until April 8; in a furnished house (villa) in Mougins until October 5; and in a furnished house in Cannes until June 20, 1956. The house in Cannes was rented under a lease from October 1, 1955, to September 30, 1956, which provided that petitioner could vacate the premises before the end of the lease on the condition that he paid the full amount of the rent.

As of June 20, 1956, petitioner and his family moved to Lausanne, Switzerland, where he lived until June 1957. He lived in Echandens, Canton of Vaud, Switzerland, from June 1957 to December 18, 1963. In February 1962, petitioner purchased a piece of land in Epalinges, Canton of Vaud, Switzerland, on which he built a house, to which he and his family moved on December 18, 1963, where they have lived up to the present time.

Petitioner's first publisher in the United States was Prentice-Hall. Through Prentice-Hall (which had control for a time over rights to publish paperbound editions of the works of Simenon in the English language), the New American Library of World Literature, Inc., was granted the first option for 5 years, under an agreement dated August 17, 1951, for the exclusive English language publication of paperbound books in the United States, Canada, and the Philippines of all the works of Simenon under royalty arrangements. It published some of petitioner's books.

In 1952, petitioner and Prentice-Hall terminated their agreement by mutual consent, and on November 25, 1952, petitioner and New American Library entered into a separate agreement under which petitioner granted New American Library a first option for the exclusive English language publication, in paperbound volume form, of all of petitioner's works, in the United States, Canada, and the

Philippines, in consideration for the payment of royalties to petitioner on such publications. The new agreement was for a period ending August 17, 1956.

The first agreement between petitioner and Doubleday was dated March 17, 1953. Under this agreement, petitioner granted Doubleday the exclusive right to print, publish, and vend in the United States, Canada, and the Philippines 20 novels written by petitioner, with a first option to negotiate for petitioner's next full-length book. Under this agreement, Doubleday was granted additional rights, to be exercised after obtaining petitioner's "consent," relating to selling a book club edition of a work to the Literary Guild of America, the Book-of-the-Month Club, and others, and other rights relating to reprints, serial publication in magazines and newspapers, and other matters. Doubleday agreed to pay royalties at varying rates and to make an advance payment of royalties of several thousand dollars.

The above agreement was superseded by a new agreement with Doubleday dated March 14, 1955, which was executed by petitioner before he left the United States on March 19, 1955. Under the new agreement, petitioner granted Doubleday an exclusive right to print, publish, and vend four books, consisting of six individual novels, in addition to the works covered by the 1953 agreement, and other rights in the same territories. Doubleday agreed to pay petitioner royalties on all copies sold, and also agreed to pay petitioner, on demand, $5,000 as an advance payment of royalties. Petitioner requested that payment of $5,000 be made upon and right after the execution of the contract. Petitioner granted Doubleday several, various, additional exclusive rights, some of which could be exercised by Doubleday only after "consultation" with petitioner. For these additional rights, Doubleday agreed to pay petitioner a substantial percentage of the proceeds of sales, such as 50 percent. The additional rights granted by petitioner included radio and television rights in connection with the literary works covered by the agreement, and the right to sell the literary works to book clubs, magazines, and newspapers.

During the period 1952 to 1955, other publishers in the United States were occasional publishers of petitioner's novels and stories (some of which were published for use in schools and were reprinted) as follows: Ellery Queen's Mystery Magazine, Jonathan Press, Mercury Publications, Harcourt Brace, and Appleton-Century-Crofts, Inc. The agreement with Appleton-Century is dated September 30, 1952.

Illustrative of the total amount of royalties in a year which petitioner received from publishers in the United States during the years 1952 through 1955, are the following: Petitioner received royalties from U.S. sources in each of the years in this period in annual total sums of around $6,000, $30,000, $21,000, and $14,000.

Petitioner also received income from the sales of motion-picture rights to some of his novels and stories from U.S. sources in each of the years 1952 through 1955, chiefly from Twentieth Century-Fox Film Corp. having offices in New York City.' He received from $10,000 to $20,000 for motion-picture rights to a particular story.

Some of the royalties involved here, paid and received in 1955, were paid under petitioner's agreements with New American Library, Appleton-Century, and the new agreement with Doubleday dated March 14, 1955.

Petitioner entered into an agreement with Twentieth Century-Fox dated May 23, 1955, which he executed in Nice, France, on that date, under which he granted Twentieth Century-Fox the exclusive motion-picture rights in his literary property entitled "The Bottom of the Bottle," for which Twentieth Century-Fox paid him $20,000 on July 5, 1955, which he received about July 19, 1955. This story was originally published in France in 1949 in the French language under a French title. The English translation of this story was copyrighted in the name of petitioner in the United States in February 1954, and was published by Doubleday in 1954 in a book, with other stories by petitioner, entitled "Tidal Wave."

Under both contracts with Doubleday, some of the novels to be published in the English language had already been written and others were to be written. The contracts did not specify any particular literary work; they referred only to the types of novels and stories to be published, a certain number of psychological novels and a certain number of mystery novels. It was agreed that the publisher could not make editorial changes in any literary work without petitioner's consent. Petitioner retained complete control over the writing of his literary works, the idea, the subject matter, plot, and entire writing of each one. The Doubleday contract of March 17, 1953, was for a period of 2 years; the contract of March 14, 1955, was for 1 year.

All of the literary works of petitioner published in the United States were and are copyrighted in the name of petitioner. All royalties paid to him were royalties under petitioner's grants of licenses under the copyrights.

During the period in which petitioner lived at Shadow Rock Farm, he set aside part of the house as his office. He carried on his work as an author and his related business affairs in this office, which he maintained until March 19, 1955.

The standard length of a book by petitioner was between 60,000 and 70,000 words, which amounted to between 150 and 200 pages. Petitioner's general practice in writing a novel or story was to make notes and an outline prior to writing, and then to write the novel or story on his typewriter in his office at Shadow Rock. He never dis-

cussed preliminarily with a publisher the idea or outline of a story or novel that he was going to write. When the completed manuscript was offered to a publisher, that was the publisher's first encounter with the product. The publisher had the right to decide whether to accept and publish or reject the manuscript after it was submitted. Petitioner also created the titles to his works and maintained a list of possible titles. He discussed with his publisher which title would be the most likely one to be successful in the U.S. market or other market covered by the publishing contract. The publisher and its sales department determined in the first instance the number of copies to be printed of each work on the basis of distribution outlets and the market. Petitioner had little control over the publication arrangements which were the province of the publisher.

After the contract of March 17, 1953, with Doubleday was executed, Doubleday was the exclusive U.S. publisher of petitioner's works, except for past contracts still in operation. The following list shows the dates of publication by Doubleday of books written by petitioner that were published under the contract of March 17, 1953:

| Title | Publication date |
|---|---|
| No Vacation for Maigret | Oct. 8, 1953 |
| Tidal Wave | Feb. 18, 1954 |
| On Land and Sea | Mar. 8, 1954 |
| Inspector Maigret and the Strangled Stripper | July 1, 1954 |
| Strangers in the House | July 15, 1954 |
| Inspector Maigret and the Killers | Nov. 18, 1954 |
| The Magician and the Moon | Feb. 3, 1955 |
| Maigret in New York's Underworld | Mar. 24, 1955 |
| Destinations | Nov. 11, 1955 |
| The Fugitive | Dec. 8, 1955 |

Petitioner reserved to himself certain rights in his literary properties, including motion-picture, radio, and television rights to the dramatization and production of his literary works through such media. His activities and interests in negotiating the sales of such rights were continuous, and such activities were carried on by him while he was a resident in the United States. Petitioner's wife acted as a business agent for petitioner. Her activities were carried on while they resided in the United States and thereafter. Under both agreements with Doubleday, it was necessary for petitioner to discuss various matters relating to his literary works frequently with the editor of Doubleday assigned to dealing with petitioner; and petitioner's wife, who worked on many details and the accounting of the royalties for him, had many discussions and much correspondence with the editor. This was true during the early part of 1955 while petitioner resided in the United States, and continued throughout 1955 after the Simenons left the United States. Under both agreements,

for example, the Doubleday editor was obliged to consult with petitioner about several types of productions of his books.

In his Form 1040 income tax return for the period January 1 to March 19, 1955, petitioner stated that his occupation is "author," and he included as part of the return Schedule C, "Profit (or Loss) From Business Or Profession." In Schedule C petitioner reported an amount as the net profit from his business after taking several business expense deductions. He included in his business deductions depreciation on his house on the basis of devoting 50 percent of his use thereof to his business; and also on that basis he took a depreciation deduction on furniture and fixtures. The amount of the entire depreciation deduction was computed on the basis of his use of the property, furniture, and fixtures for business purposes during 78 days in 1955, i.e., 31 days in January, 28 days in February, and 19 days in March. Petitioner took business expenses deductions totaling $9,355.46 (of which respondent disallowed a claimed traveling expense of $3,814.48, and allowed the net amount of deductions of $5,540.98), as follows:

| | |
|---|---|
| Traveling expenses [1]_____ | $5,054.25 |
| Legal and accounting fees_____ | 1,484.28 |
| Entertainment_____ | 773.97 |
| Stationery and printing_____ | 516.91 |
| Auto expense_____ | 858.77 |
| Photographs, publicity_____ | 186.45 |
| Postage_____ | 48.42 |
| 50 percent utilities_____ | 230.11 |
| 50 percent building maintenance_____ | 202.30 |
| | 9,355.46 |

[1] $3,814.48 disallowed; $1,239.77 allowed.

The total business deductions taken in the return was $12,717.57, which consisted of salaries and wages, $2,987.37; depreciation, $374.84; and other business expenses (supra), $9,355.46. In his computation of the amount of the income tax reported on the return, petitioner entered $126 as his self-employment tax, computed in Schedule C on the basis of the amount of the net profit from his business reported in that schedule.

One of the items that respondent added to petitioner's taxable income for 1955 is $5,000 of advance royalties paid by Doubleday under the new contract dated March 14, 1955, which amount was payable on demand. Before the contract was executed, petitioner advised the Doubleday editor in charge of the contract that he elected to exercise his right to receive the above amount of advance royalties. Although petitioner executed the new contract before leaving the United States on March 19, and Doubleday agreed before that date to make immediate payment of the advance royalties, the office proce-

dures at Doubleday were such that the payment was not made until March 28, 1955.

1. Petitioner failed to prove that he was a "resident" of France in 1955 within the meaning of that term as used in article 7 of the tax convention with France.

2. For several years prior to 1955, and during the period January 1 to March 19, 1955, petitioner was engaged in carrying on a business in the United States which included writing literary works and promoting the sale of rights therein to others for profit and as a means of earning his living, dealing with publishers and others, and negotiating contracts under which he granted various rights in his literary works in return for the receipt of royalties and fixed amounts.

3. For several years prior to 1955 and during the period January 1 to March 19, 1955, petitioner maintained an office at his home, Shadow Rock Farm. This office was his business headquarters and fixed place of business at and from which he carried on his business activities, and it constituted a "permanent establishment" of petitioner in the United States within the meaning of that term as used in article 7 of the tax convention with France. Petitioner had a permanent establishment in the United States during part of 1955 until March 19, 1955.

OPINION

Royalties from sources within the United States, in the amount of $25,291.95, were paid to petitioner in 1955 after he left the United States on March 19, 1955. Petitioner did not include these royalties in his gross income on his return for 1955. He took the position that they are exempt from the U.S. income tax under the provisions of article 7 of the income tax convention, or treaty, between the United States and France. The respondent made the following determinations: (1) That article 7 of the income tax treaty does not apply because petitioner had a "permanent establishment" in the United States at some time during 1955, i.e., during the period January 1 through March 19, 1955. (2) That since the treaty exemption does not apply, the royalties are subject to the U.S. income tax under section 871(c) of the 1954 Code.[1]

The issue for decision is whether the royalties in question, from U.S. sources, are exempt from the U.S. income tax under article 7 of the income tax treaty with France. Section 894 of the Code exempts from

---

[1] SEC. 871. TAX ON NONRESIDENT ALIEN INDIVIDUALS.

(c) UNITED STATES BUSINESS.—A nonresident alien individual engaged in trade or business within the United States shall be taxable without regard to subsection (a). For purposes of part I, this section, sections 881 and 882, and chapter 3, the term "engaged in trade or business within the United States" includes the performance of personal services within the United States *at any time within the taxable year,* * * * [Italics added.]

the Federal income tax income of any kind, "to the extent required by any treaty obligation of the United States." The tax treaty involved is the income tax convention with France which was signed on July 25, 1939, and in due course became effective on January 1, 1945. Article 7 of the convention, in title I, Double Taxation, provides as follows: [2]

Royalties derived from within one of the contracting States *by a resident* or by a corporation or other entity *of the other contracting State* as consideration for the right to use copyrights, patents, secret processes and formulae, trade marks and other analogous rights *shall be exempt from taxation in the former State, provided such resident,* corporation or other entity *does not have a permanent establishment there.* [Italics added.]

It is provided in the tax treaty in title II, Fiscal Assistance, art. 26, that each of the contracting States "may prescribe regulations necessary to interpret and carry out the provisions of this convention." Pursuant to this treaty provision and section 62 of the 1939 Code, the respondent promulgated regulations under the income tax treaty with France on February 27, 1946, in T.D. 5499, 1946–1 C.B. 134, 142–148. The provisions of these regulations originally were numbered as sections 7.411 through 7.426, but the provisions were renumbered on January 1, 1961, 26 C.F.R. part 514, as sections 514.102 through 514.117. See P.-H., Tax Treaties, par. 38,001 *et seq.*, and C.C.H., Tax Treaties, pars. 2850–2865. The respondent's regulation under article 7 of the income tax treaty with France, section 514.109 (formerly sec. 7.418), provides as follows:

SEC. 514.109 PATENT AND COPYRIGHT ROYALTIES.—Royalties derived from sources within the United States by a nonresident alien individual who is *a resident of France,* or by a French corporation or other French entity, as consideration for the right to use copyrights, patents, secret processes and formulae, trade-marks and other analogous rights, are exempt from Federal income tax under article 7 of the convention, *provided that such individual,* corporation, or other entity *has no permanent establishment within the United States at any time during the taxable year in which such income is so derived.* Thus a nonresident alien who is a resident of France, rendering personal services within the United States, is not subject to tax with respect to such royalties even though he is engaged in trade or business in the United States by reason of rendition of such services so long as he has no permanent establishment in the United States.

To obviate withholding of tax at the source, the nonresident alien individual resident of France or the corporation or other entity organized under the laws of France, as the case may be, shall notify by letter the person paying such income that the income is exempt from taxation under the provisions of the applicable convention and protocol. *The letter of notification from an individual resident of France shall contain his address and a statement that he is a resident of France.* The letter of notification from a corporation or other entity organized under the laws of France shall contain the address of its office or place of busi-

---

[2] The income tax convention and protocol between the United States and France signed July 25, 1939, effective Jan. 1, 1945, is included in T.D. 5499, 1946–1 C.B. 134–141. It is also printed in 1 Legislative History of United States Tax Conventions 905–931 (U.S. Government Printing Office, 1962, in 4 vols.).

ness and a statement that it is a corporation or other entity organized under the laws of France, shall be signed by an officer of such corporation or entity, and shall set forth his official title. *In the case of royalties derived on or after January 1, 1945, the letter of notification shall also state that the individual resident of France,* or corporation or other entity organized under the laws of France, as the case may be, *does not have a permanent establishment in the United States and will not have such establishment in the United States at any time during the calendar year in which such royalties are paid.* The recipient of the letter of notification shall immediately forward such letter or a copy thereof to the Commissioner of Internal Revenue, Withholding Returns Section, Washington 25, D.C.

[Italics added.]

The parties agree that the U.S. source royalties, paid under petitioner's rights as an author under his copyrights of his literary properties, are royalties within the provisions of article 7 of the income tax convention. Their dispute relates to whether the other conditions in article 7 are satisfied, namely, (1) whether in 1955 petitioner was "a resident" of France within the meaning and for the purposes of article 7; and (2) whether in 1955 petitioner had a "permanent establishment" in the United States within the meaning of that term in article 7. Both questions are presented by the pleadings. Since all of the conditions prescribed in article 7 must be satisfied to obtain exemption from the U.S. income tax on the royalties, respondent's determination must be sustained if petitioner fails in establishing that either one of the above conditions was satisfied. The burden of proof was upon the petitioner under every question presented.

It is respondent's position that petitioner failed to prove that he was "a resident" of France under the meaning of that term in article 7 of the tax convention; and that the evidence establishes that petitioner did have a "permanent establishment" in the United States at some time during 1955. With respect to the latter, respondent makes two contentions. He contends that petitioner had at Shadow Rock Farm in Connecticut an "office" or "other fixed place of business" from January 1, 1955 (and before that date), until his departure on March 19, 1955, within the meaning of article III of the protocol, which is an integral part of the tax convention, in which the term "permanent establishment" is defined as including offices and other fixed places of business.[3] He also contends that section 514.109 of his regulation,

---

[3] Art. III: As used in this convention:

(a) the term "permanent establishment" includes branches, mines and oil wells, plantations, factories, workshops, stores, purchasing and selling and other offices, agencies, warehouses, and other fixed places of business but does not include a subsidiary corporation.

When an enterprise of one of the contracting States carries on business in the other State through an employee or agent, established there, who has general authority to negotiate and conclude contracts or has a stock of merchandise from which he regularly fills orders which he receives, this enterprise shall be deemed to have a permanent establishment in the latter State. But the fact that an enterprise of one of the contracting States has business dealings in the other State through a bona fide commission agent or broker shall not be held to mean that such enterprise has a permanent establishment in the latter State.

*supra*, represents a valid interpretation of the term "permanent establishment" in article 7 of the convention, in the provision of the regulation which states that the individual or entity claiming the particular exemption from taxation must establish that he "has no permanent establishment within the United States at any time during the taxable year in which such income is so derived." This provision in the respondent's regulation is known as the "at any time" rule. Respondent relies upon the approval of the "at any time" rule, with respect to the treaty word of art, "permanent establishment," in *Jules Samann*, 36 T.C. 1011, aff. 313 F. 2d 461 (C.A. 4, 1963), which involved a provision (art. VIII) in the income tax convention between the United States and Switzerland of 1951, which is substantially the same as article 7 in the convention with France.

Petitioner contends that he was "a resident" of France in 1955 and satisfied the residence requirement of article 7; and that he did not have a "permanent establishment" in the United States. He argues that *Samann* was incorrectly decided and urges reconsideration by this Court of its holding in that case.[4]

### 1. Preliminary Matters

There are some minor questions which should be disposed of, whether petitioner became a nonresident in 1955, and whether he was entitled to report income on the basis of a short taxable period for 1955. Both questions involve petitioner's status in the calendar year 1955 with respect to the U.S. income tax.

(a) Petitioner was a resident alien in the United States for several years prior to 1955 and filed income tax returns. Whether or not his status changed in 1955 to that of a nonresident depends upon the facts in a particular case. Section 1.871-5 of the regulations provides that "An alien who has acquired residence in the United States retains his status as a resident until he abandons the same and actually departs from the United States." Departure plus intention to abandon U.S. residence are necessary to terminate an alien's status for tax purposes as a resident. *John Ernest Goldring*, 36 B.T.A. 779. Petitioner, with his family, left the United States on March 19, 1955. He went to France and was present in that country during the rest of 1955.

---

[4] Petitioner's return for 1955 was filed on Apr. 30, 1957, with the director of the international operations division of the Internal Revenue Service, which division, as of May 1, 1956, was and now is in the national office in Washington, D.C., rather than in the Baltimore district. Under sec. 7482(b)(1) of the Code (except as provided in par. (2) thereof), the decision in this case may be reviewed by the U.S. Court of Appeals for the District of Columbia (rather than the U.S. Court of Appeals for the Fourth Circuit), which is the judicial circuit in which is located the office of the respondent to which petitioner's 1955 return was made. See Rev. Proc. 56-18, 1956-1 C.B. 1043, by which the international operations division was transferred from the Baltimore district to the national office in Washington, D.C.

Whether or not he became a "resident" of France in 1955, as that term is used in article 7 of the convention, is one of the issues in this case under which petitioner had the burden of proof, which is discussed hereinafter. It is sufficient to note here that the question of whether petitioner abandoned his status as a resident of the United States in connection with his departure on March 19, 1955, is a question of fact under which, also, petitioner had the burden of proof.

(b) Section 514.109 of the regulations of the respondent under article 7 of the tax convention (T.D. 5499, *supra*) provides that royalties are exempt from the Federal income tax provided the individual or entity "has no permanent establishment within the United State *at any time during the taxable year in which such income is so derived.*" (Italics added.) Petitioner alleged in his petition that his taxable year for the purpose of the U.S. income tax ended on March 19, 1955, "insofar as treatment of subsequently received royalty income from United States sources under the aforesaid Tax Convention was concerned," which respondent denied. Petitioner made his return for 1955 on the basis of a short taxable period, January 1 through March 19; he used Form 1040, reporting income as a resident alien during the short period; he took the position that under article 7 of the convention he did not have as a nonresident alien during the balance of 1955 any taxable income from sources within the United States. The pleadings present the question whether petitioner's taxable year was the calendar year 1955, or a short period of less than 12 months.

Section 441 of the Code provides that taxable income shall be computed on the basis of the taxpayer's "taxable year," which means his annual accounting period, either the calendar year or a fiscal year, and that the term "annual accounting period" means "the annual period on the basis of which the taxpayer regularly computes his income in keeping his books." Petitioner did not establish that prior to 1955 he had not regularly computed and reported his income on the basis of a calendar year. Lacking evidence to the contrary, it is found and concluded that his regular accounting period was the calendar year. *Van Der Elst* v. *Commissioner*, 223 F. 2d 771, 773.

Section 443 of the Code provides that a return shall be made for a "short period" of less than 12 months under certain circumstances, but petitioner, on whom the burden of proof rests, has not established that he was entitled to make a 1955 return for a period that was different from and less than a period of 12 months, which evidently was the annual period on the basis of which he had regularly computed and reported his income prior to 1955.

For tax purposes an alien may be a resident for part of a taxable year and a nonresident for the balance of the same year, *Marsman* v.

*Commissioner*, 205 F. 2d 335 (C.A. 4, 1953), affirming in part 18 T.C. 1, and under such circumstances he has a dual status as a taxpayer and his taxable year is known and treated as a dual-status taxable year. *If* petitioner had a dual status for income tax purposes in 1955, a question which we do not and need not decide, that taxable year was a dual-status taxable year. Respondent has promulgated a pamphlet which deals with the reporting of income for the purpose of the Federal income tax by alien taxpayers having a dual-status tax year, "Dual-Status Tax Years of Alien Taxpayers," Information Guide No. 3, Office of International Operations. In general, such dual-status taxpayer must file his return on Form 1040, on which he must report separately the respective amounts of taxable income derived during the periods of residence and nonresidence, and the tax is computed separately for each period, giving effect to applicable tax treaty provisions, if any. Petitioner's annual accounting period and taxable year for each taxable period prior to 1955, as a resident alien, was the calendar year of 12 months, and his 1955 taxable year continued to be the 12-month calendar year. The only difference might be that 1955 was a dual-status tax year. If the U.S. source royalty income is held to be exempt from U.S. tax under the tax convention, it was not includable in gross income for 1955 on Form 1040. If the royalties are not exempt from the U.S. tax, it follows that they should have been reported separately on the return which petitioner filed for 1955, since only one return, Form 1040, is to be filed by an alien taxpayer for a dual-status year. For the purposes of considering the application of article 7 of the tax convention to the royalty income in issue, petitioner's taxable year was the 12-month calendar year of 1955. *Van Der Elst* v. *Commissioner, supra.*

## 2. Treaty Article 7, Resident of France

The U.S. income tax law comprises two independent concepts of jurisdiction, the status of the taxpayer and the source of income; and with respect to the individual income tax, the United States asserts tax jurisdiction over the entire worldwide income of its citizens and alien residents. On the other hand, nonresident aliens are taxed only on income derived from sources in the United States, the contact of the U.S. tax jurisdiction being the source of the income rather than the recipient-person. Section 861(a) (4) of the Code provides that rentals and royalties shall be treated as income from sources within the United States if derived from "property located in the United States or from any interest in such property, including rentals or royalties for the use of or for the privilege of using in the United States patents, copyrights, secret processes and formulas, * * * and other like property."

See also sec. 1.861–5, Income Tax Regs. Section 894 of the Code provides for the supersedence of tax treaty provisions over Internal Revenue Code provisions, when and if tax treaty provisions are applicable; it provides the "Income of any kind, to the extent required by any treaty obligation of the United States, shall not be included in gross income and shall be exempt from taxation under this subtitle [Subtitle A—Income Taxes]." See also sec. 7852(d).

If petitioner was a nonresident alien during the period March 20 through December 31, 1955, he is taxable on the U.S. source royalties, paid while he was a nonresident, under the source rule set forth in section 861(a) (4), unless such income is exempted from U.S. taxation by a treaty obligation. His burden includes proving that a treaty obligation requires that the royalty income shall be exempt from U.S. taxation. He claims that the royalty income comes within article 7 of the tax convention with France, a country of which he is not a citizen. Unlike the case of *Jules Samann, supra* at 1012, it is not agreed here that the taxpayer was a resident for tax purposes of the country having a tax convention with the United States, a provision of which is invoked by him. Unless petitioner was "a resident" of France for the purposes and within the scope of article 7 of the tax convention with France, the royalties are taxable by the United States under the source rule set forth in section 861(a) (4), and section 894 is inapplicable as there is not a treaty obligation to take supersedence over the U.S. tax law. Petitioner must prove that the royalty income is not taxable to him under section 861(a) (4).

In this case the royalty income was derived within the United States and for the purposes of article 7 of the tax convention, France is "the other contracting State." The question in this instance whether the petitioner-recipient was "a resident * * * of the other contracting State" relates to the meaning of the statutory condition in article 7 that the recipient must be a resident of France. This question is one of statutory construction. There is no definition in the convention and protocol of "resident" as that term relates to an alien in France.

In general, the courts will look primarily to the legislative purpose as well as the context of a statute in the construction thereof. "Resident" and "residence," as used in law, have various degrees of meaning from temporary physical presence to permanent abode, and the meaning of these words in a statute depends upon the context and the purpose of the statute in which they occur. *In re Jones,* 19 A. 2d 280, 282; *District of Columbia* v. *Fleming,* 217 F. 2d 18, 20.

The meaning of "resident" of France within the context and for the purpose of article 7 of the tax convention with France is a question of law as well as fact. We believe that obviously the question is

a question under particular laws of France, French tax law.[5] The rule relating to establishing a matter of foreign law is that judicial notice by a court cannot be taken of foreign law, as opposed to local law, the laws of the United States and general matters of domestic law, to which the concept of judicial notice extends. Under article VI, clause 2, of the Constitution, treaties are laws of the United States, *American Trust Co.* v. *Smyth*, 247 F. 2d 149, 153 (C.A. 9, 1957), so that we may take judicial notice of the tax treaty with France; but where, in the context of a treaty, the meaning of a treaty term depends upon a law of the foreign country, we may not ascertain the question of foreign law by resorting to judicial notice. A question of foreign law is a question of fact to be proved by the party having the burden of proof, here, the petitioner. *Commissioner* v. *Hyde*, 82 F. 2d 174 (C.A. 2, 1936), reversing on another issue 31 B.T.A. 256; *Bernhard Altmann*, 20 T.C. 236, 248 (appeal dismissed by agreement of parties; remanded only for adjustment of the amount of the deficiency according to the parties' stipulation); 9 Mertens, Law of Federal Income Taxation, sec. 50.85, pp. 173–175. We believe it is clear that in the context of the entire tax convention with France and, in particular, of article 7, the word "resident," with respect to France, means "resident" of France for French tax purposes under French tax statutes and laws.[6] One purpose of the tax convention with France is the avoidance of double taxation of the same income by the two contracting States. Double taxation of the same income would result where certain income is taxable in the source State and is taxable, also, by the State in which the recipient is a resident for tax purposes. To avoid such double taxation, the tax convention with France contains provisions under which certain types of income are taxable by either the source State or the other contracting State, which imposes the tax because the recipient is a *resident for tax purposes*. Throughout the tax convention with France, provisions relate to "a resident" of

---

[5] See World Tax Series, Harvard Law School International Program in Taxation, Taxation in the United States, sec. 11/5.2d, p. 1154, Interpretation of Treaties, where the following is stated: "Many of the important concepts used in the treaties are defined in the treaties. Generally, the classes of qualifying recipients are also defined. Any term not defined in the treaty is to be interpreted according to the laws of the country imposing the tax in question. * * * In addition, the context of the treaties requires that for some terms, such as a 'resident' of the foreign country, the United States must look to the law of the foreign country."

[6] The term "resident," with respect to a contracting State other than the United States, is defined only in the tax conventions with Australia, New Zealand, Ireland, Pakistan, and the United Kingdom. Art. II (1)(i) of the convention with Pakistan defines the term "resident of Pakistan" as "any person (other than a citizen of the United States or a United States corporation) who is resident in Pakistan for the purposes of Pakistan tax and not resident in the United States for the purposes of the United States tax." Art. II(1)(g) of the convention with the United Kingdom defines "resident of the United Kingdom" as "any person (other than a citizen of the United States or a United States corporation) who is a resident in the United Kingdom for the purposes of United Kingdom tax and not resident in the United States for the purposes of United States tax."

France, and article 14B of the convention provides: "However, the provisions of the first paragraph of article 114 of the French Code on direct taxation relative to the taxation of aliens domiciled or resident in France shall continue to be applied." In the reports to the U.S. Senate Committee on Foreign Relations on the then-proposed tax convention with France (which was before the Senate for ratification), general references are made to taxation by France of aliens who are either domiciled in or residents of France, and to the several classes of French taxes affected by the convention. See, for example, Executive Rept. No. 7, 76th Cong., 3d Sess., pp. 5, 12, 1 Legislative History of United States Tax Conventions, *supra* at 845, 849, 856.

The question with respect to whether petitioner was "a resident" of France in 1955 is whether he was *qualified* for tax relief under article 7 of the tax convention. Article 7 supersedes sections 861(a)'(4) and 871(c) of the 1954 Code only if petitioner proves that he was qualified under article 7; one of the qualifications is that he was a resident of France for the tax purposes of France; and petitioner had the burden of proving that he was an alien resident of France in 1955 under French tax law for French tax purposes.

The only evidence relating to this question is about petitioner's presence in France. There is no evidence about the following: His intentions of either being a sojourner or of becoming a resident of France for French tax purposes; the French tax law requirements about being an alien resident of France for French tax purposes; what facts must be shown to establish being an alien resident for French tax purposes; what regulations have been adopted by France under article 26 of the tax convention. There is no proof of the "resident" question under French tax law. We do not have proof of the French legal standards to apply to the facts here about petitioner's presence in France.

Petitioner did not attempt to meet his burden of proof under the question of the resident-of-France qualification and requirement. Rather, he has argued that the answer is to be found in the provisions of section 1.871–2 of the Income Tax Regulations under the 1954 Code, which defines alien "resident" of the United States for income tax purposes. He refers to section 514.104 (formerly sec. 7.413) of respondent's regulations under the convention (T.D. 5499, *supra*), which states that any term used in the treaty regulations "which is not defined in the convention but is defined in the Internal Revenue Code shall be given the definition contained therein." Section 1.871–2 of the Income Tax Regulations provides that—

An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. *Whether he is a transient is determined by his intentions with regard to the length and nature of his stay.* * * * *If he lives in the United States and has no definite intention as to his stay, he is a resident.* [Italics added.]

Since the convention with France does not contain a definition of "resident" with respect to each of the contracting States (as, for example, does the income tax convention with Luxembourg in art. II(1)(h)), the *respondent* may, under the rule of *mutatis mutandis*, apply the standard or test in the above provision of the above regulations, with respect to the question whether an alien individual is a "resident" of France for the purpose of the French tax convention. Where the taxpayer who claims that he is entitled to the benefit of a provision in the French tax convention (and where he has the burden of proving that he was a "resident" of France for French tax purposes) seeks to apply the standard set forth in the above income tax regulation under our Internal Revenue Code, he must prove a fact question, namely, what his intentions were with regard to "the length and nature of his stay" in France. Petitioner did not introduce any evidence on these matters, and the record does not show what his intentions in 1955 were with regard to the length and nature of his stay in France; or whether he had no definite intention about such stay; or whether it was his intention in 1955 to be a mere transient and sojourner in France. We may not assume that he did not have some definite intention as to his stay in France in 1955; we may not assume that he was in 1955 a "resident" of France for French tax purposes. Because of lack of proof in these matters, we cannot find and conclude that in 1955 petitioner became a "resident" of France for French tax purposes, rather than a transient or sojourner in France. The purpose of the convention with France is to avoid double taxation of the same income by both contracting States. Petitioner has not shown that the royalty income in dispute was subject to the general French income tax.

Petitioner failed to prove that he was qualified for the claimed tax relief under article 7 of the convention on the basis that in 1955 he was "a resident" of France for French tax purposes. This element of failure of proof is sufficient to disqualify petitioner for the tax relief in dispute. However, because of the novelty of the question, we also give consideration to whether petitioner had a "permanent establishment" in the United States during part of 1955, from January 1 to March 19.

### 3. Treaty Article 7, Permanent Establishment

Respondent determined that petitioner had a "permanent establishment" in the United States during part of 1955 where he carried on a trade or business. He contends that petitioner maintained an office in his home at Shadow Rock Farm which constituted a permanent establishment within the meaning of article 7. His contention is limited to the period January 1 to March 19, and to the office at petitioner's home. Respondent's regulation in conjunction with article 7

states that royalties derived from U.S. sources by a nonresident individual, who is a resident of France, are exempt from the U.S. Federal income tax, provided that such individual has no permanent establishment within the United States "at any time" during the taxable year in which such income is so derived. Sec. 514.109 of the regulations, T.D. 5499, *supra*. Respondent relies on this construction of "permanent establishment" in article 7, known as the "at any time rule." Article III(a) of the protocol, which is part of the convention, defines the term "permanent establishment" broadly (see fn. 3), and as including "workshops," "other offices," and "other fixed places of business." Subsection (b) of article III defines "enterprise" as including "every form of undertaking whether carried on by an individual," corporation, or any other entity. Respondent's position is that petitioner carried on a business in the United States, consisting of his activities as a professional author who wrote stories for the purpose of selling rights in them; that he carried on this business at an office, workshop, and place of business at his home in Connecticut during the period January 1 to March 19, 1955 (and prior thereto); and that he therefore had a permanent establishment in the United States during the taxable year in which the royalties were derived.

Petitioner disagrees with all of respondent's contentions. Although he admits that he worked on his writings at his home, and that in connection therewith he deducted various business expenses and allowances for depreciation on his return for 1955, petitioner argues that those facts are not material. Petitioner contends that he did not have a "permanent establishment" in the United States from January 1 to March 19, 1955, within the meaning of that term as it is used in article 7 of the convention. If it is held that the place at his home where he worked constituted a permanent establishment during the above period, petitioner then contends in the alternative that respondent erred in not treating the royalties as exempt from U.S. income tax because he did not have such permanent establishment in the United States in 1955 after March 19, since the disputed royalties were derived from U.S. sources after March 19. It is petitioner's view that the royalties are exempt from our income tax if he did not have a permanent establishment in the United States during the period in 1955 (Mar. 20 to Dec. 31) in which they were paid, i.e., "derived"; and that the "at any time" rule in the respondent's regulation under article 7, adopted in conjunction with the tax convention, is invalid because it constitutes a restriction of the provisions of article 7. Petitioner argues that *Jules Samann, supra*, incorrectly held to be valid the "at any time" rule in a similar regulation under a similar provision in the tax convention with Switzerland.

In *Samann* (p. 1014), the taxpayer admitted that he had a permanent establishment in the United States during part of the taxable

year, so that we did not have before us that question. Here, respondent admits that petitioner did not have a permanent establishment in the United States during the period March 20 to December 31, 1955, and petitioner does *not* admit having one here at any time. We would not reach the question whether petitioner had a permanent establishment here from January 1 to March 19, 1955, if respondent's "at any time" rule in his regulation is an invalid interpretation and restriction of article 7 of the convention. We regard the two questions as interrelated, so that they should be considered together. We have reconsidered the question of the validity of respondent's "at any time" rule. We have considered fully all of the evidence and petitioner's arguments. Our conclusion is that respondent's understanding of the use and meaning of the term "permanent establishment" in article 7 of the convention is correct; that his regulation is valid; and that petitioner had a "permanent establishment" here from January 1 to March 19, 1955, and, therefore, the royalties are subject to the U.S. income tax. Respondent's determination must be sustained. These conclusions are based upon the following considerations.

First, nothing in this case, in principle, serves to distinguish it from *Jules Samann, supra,* with respect to the validity of section 514.109 (formerly sec. 7.418) in T.D. 5499, *supra,* the applicable regulation under the tax convention with France. We have compared the provisions in the French tax convention with the provisions in the Swiss tax convention, and we have compared also the respective regulations of the respondent under each convention, dealing with royalties. Article VIII of the Swiss convention (see *Samann,* p. 1013) is practically the same as article 7 of the French convention; and the same is true of respondent's regulation adopted in conjunction with each tax convention. The regulations under the Swiss convention were issued as T.D. 6149, 1955-2 C.B. 814, in which section 509.110 deals with royalties. The provisions of section 509.110 in T.D. 6149 (relating to the Swiss convention) are practically the same as the provisions of section 514.109 in T.D. 5499 under article 7 of the French tax convention. Therefore, what was said by this Court in *Samann* (pp. 1014–1016) about the validity of respondent's "at any time" rule in connection with the treaty term "permanent establishment" in article VIII of the Swiss tax convention applies equally here in considering the treaty term "permanent establishment" in article 7 of the French tax convention.

We noted in *Samann* (p. 1016) that article XIX of the Swiss tax convention expressly authorized the respective contracting States to adopt regulations necessary to carry into effect the provisions of the convention; and that "Regulations, especially when expressly authorized, * * * carry, of course, a strong presumption of validity."

*Farrel-Birmingham Co.* v. *United States*, 121 F. Supp. 636, modified on other grounds 125 F. Supp. 297. It has been noted herein, *supra*, that article 26 of the 1939 convention with France authorizes the competent authorities of each of the contracting States to "prescribe regulations necessary to interpret and carry out the provisions of this Convention." (See also arts. 13 and 16 of the supplementary tax convention between the United States and France, signed Oct. 18, 1946, effective Jan. 1, 1950, which likewise authorizes the competent authorities of the two contracting States to prescribe such regulations.) The respondent's regulations under the convention with France, promulgated as T.D. 5499, *supra* at 142, were adopted pursuant to article 26 of the convention, as is stated therein. Those regulations, T.D. 5499, were promulgated on February 27, 1946, and had remained in effect for 8 years up to 1955; and they have remained in effect in substantially all respects up to the present time. It is well settled that a regulation of long standing (such as sec. 514.109 in T.D. 5499, applying the "at any time" rule to the treaty term "permanent establishment"), promulgated by the department charged with the enforcement of the statute, is entitled to great weight and will be followed unless unreasonable or inconsistent with the statute involved. *Commissioner* v. *Wheeler*, 324 U.S. 542; *Helvering* v. *Wilshire Oil Co.*, 308 U.S. 90; *Brewster* v. *Gage*, 280 U.S. 327; and *Lykes* v. *United States*, 343 U.S. 118, 127. It is apparently true (and there is no evidence here to the contrary) that the Government of France has long been acquainted with the respondent's interpretation of the treaty term "permanent establishment" in article 7 of the tax convention, as set forth in section 514.109, T.D. 5499 (the "at any time" rule), and has acquiesced in it as representing a correct interpretation of article 7. Moreover, substantially the same provisions as are contained in the regulation, sec. 504.109, T.D. 5499, are contained in the general regulations adopted in conjunction with several treaties with other countries relating to the same type of royalty income. See *Jules Samann*, *supra* at 1015.

"The basic aim of treaty interpretation is to ascertain the intent of the parties who have entered into the agreement, in order to construe the document in a manner consistent with that intent." *Maximov* v. *United States*, 299 F. 2d 565, 568. See also *Rocca* v. *Thompson*, 223 U.S. 317, 331–332. To give the specific words of a treaty (convention) a meaning consistent with such intent, the entire context of the agreement must be examined. We have followed this rule here. With respect to article 7 of the convention with France, dealing with royalties, the exemption from taxation by one of the contracting States is not absolute. Rather, it is a qualified provision and one of the conditions is that the recipient of the royalties does not have a permanent establishment in the State which could impose a tax on them. This

qualification and condition in article 7 represents a reservation on the part of each contracting State. It is significant in this connection that article 14 of the convention is a "savings clause" which applies to each contracting State (which corresponds to and is about the same as art. XV of the Swiss convention), which indicates that the sole objective of the convention with France is to avoid the assessment of tax in both countries upon the same items of income and that otherwise each of the contracting States retained its own system of taxation. Article 14A provides in part that the United States retained the right to "include in the basis upon which such taxes [income and excess profits taxes and all surtaxes] are imposed, all items of income taxable under the Revenue Laws of the United States of America, as though this Convention had not come into effect"; and article 14B (relating to France's reservations) provides in part that "The income other than that indicated in the preceding paragraph shall not be subject to any schedular tax in France when, according to this Convention, it is taxable in the United States of America." In *American Trust Co.* v. *Smyth*, 247 F. 2d 149, 154, the court noted that the presence of a "savings clause" in a treaty, or the absence of one, is significant, and stated, "Thus, it seems that the savings clause was incorporated into certain treaties with the express purpose of limiting exemptions."

Article 3 of the tax convention with France expressly distinguishes six categories of income, namely, the general class of income, "industrial and commercial profits," and the specific types of income *which are excluded from "industrial and commercial profits,"* i.e., income from (a) real property; (b) mortgages, public funds, securities and mortgage bonds, loans, deposits, and current accounts; (c) dividends; (d) rentals or royalties from leasing interests in personal property, and royalties for the use of patents, copyrights, franchises, and other like property; and (e) profit or loss upon the sale or exchange of capital assets; and it is provided that subject to the provisions of the convention the income referred to in paragraphs (a) through (e) "shall be taxed separately or together with industrial and commercial profits in accordance with the laws of the contracting States." Then, article 7 of the convention deals specifically with the several kinds of royalties, treating royalties from real property separately from royalties derived from several kinds of personal property, including copyrights; and with respect to royalties from personal property, one of the conditions for exemption from a tax is that the recipient of the royalties shall "not have a permanent establishment there." As was noted in *Samann* v. *Commissioner*, 313 F. 2d 461, 463—

"Permanent establishment" is almost a treaty word of art. * * * and nearly all of them [tax treaties] use the term. Furthermore, in each instance the phrase has been qualified by a Treasury regulation conforming it to the "at any

time" rule—the current usage instead of the negative "at no time". None of the illustrative treaties contains within itself any pertinently corresponding phrase. These agreements all antedate 1951 and their translation by the Treasury in this manner and to this extent has continued uninterruptedly ever since their inception. A regulation of such constancy is staunchly endowed with a presumption of validity.

The respondent's regulation under article 7 of the convention, sec. 514.109, *supra,* issued pursuant to the convention, making royalty income of a nonresident alien for the entire taxable year subject to the U.S. tax if at any time during the year he had a permanent establishment in the United States, is consistent with both the convention and our Internal Revenue Code. Section 871, 1954 Code, which is the key provision, contains various rules for determining the income and the tax liability of nonresident alien individuals under various circumstances, and an important distinction is made in section 871 between nonresident aliens "not engaged in trade or business within the United States" (subsecs. (a) and (b)) and those who are so engaged (subsec. (c)). This distinction has been made in our revenue statutes consistently since 1936 (sec. 211, Revenue Act of 1936). The Treasury regulations under section 211 of the Revenue Act of 1936, and under the corresponding sections of subsequent revenue acts and Codes, have provided continuously and consistently, in effect, that the statutory rules applicable to nonresident alien individuals engaged in trade or business within the United States shall apply for the *entire* taxable year, if the alien was engaged in trade or business within the United States *at any time* during the taxable year. See, e.g., secs. 1.871–7(a) (3), 1.871–7(d), 1.871–8, 1.872–1 (b) and (c), and 1.875–1, Income Tax Regs. (1954 Code); sec. 39.211–7(a), Regs. 118 (1939 Code); sec. 29.211–7(a), Regs. 111 (1939 Code); and art. 211–7(a), Regs. 94 (Revenue Act of 1936). The same rule applies to foreign corporations. See *Helvering* v. *Scottish American Inv. Co.,* 139 F. 2d 419, 422 (C.A. 4), affd. 323 U.S. 119. Application of this rule to a nonresident alien doing business in the United States for a portion only of a taxable period was upheld in *Hay* v. *Commissioner,* 145 F. 2d 1001, 1007 (C.A. 4), certiorari denied 324 U.S. 863. See also *Van Der Elst* v. *Commissioner, supra.* In other words, continuously and consistently since 1936, it has been the fiscal policy and statutory design of the United States that the incidents of Federal taxation which apply to a nonresident alien individual or corporation engaged in business in the United States shall apply to the U.S. source income for the *entire* taxable year, even though the alien has been engaged in business in the United States for only a portion of the taxable year.

The significant analogue in our revenue statutes and Treasury regulations of "permanent establishment" is the category of "not engaged in a trade or business within the United States." The above

terms have been interpreted regularly in the U.S. tax law as the respondent contends here, and also contended in *Samann*. Our conclusion in this case is, therefore, that no offense is done our understanding with the French Government when, with their consent, we "endue" the terms and the conditions in article 7 of the convention, relating to an exemption from a tax on royalties, with the meaning which those terms import in the tax phraseology of the United States. See *Commissioner* v. *Samann, supra* at 464.

We conclude, therefore, that the interpretation taken by the respondent in section 514.109 of his general regulations under the convention, with respect to the treaty term "permanent establishment" in article 7, reflects and is consistent with the intent of the contracting States relative to the conditions upon which U.S. source royalties received by a nonresident alien (who is a resident of France) would or would not be exempt from the U.S. income tax. We are of the opinion also that section 514.109 of the regulations under article 7 of the convention is not arbitrary, unreasonable, or in conflict with any of the provisions of the convention as a whole and article 7 in particular. In so holding, we are attentive to the principle that the competent authorities of one of the contracting States (United States) cannot through regulations contract or expand the terms of a treaty, an international contract. Cf. *Blatt Co.* v. *Commissioner*, 305 U.S. 267, 279. In our opinion the instant regulation of the respondent does not impinge upon or engraft anything upon the terms of article 7 of the convention. As has been stated under a similar situation, "The regulation is but exegetical." *Commissioner* v. *Samann, supra* at 463.

At this point, reference is again made to petitioner's alternative argument that his taxable year 1955 should be split and that he should be liable for tax by the United States on royalty income only with respect to the period January 1 through March 19, 1955. We have already dealt with this argument, *supra*. We need only add that the term "taxable year" was used in section 514.109 of the general regulations under the convention in the usual statutory sense. As was pointed out by the Court in *Commissioner* v. *Samann, supra* at 464, the cases *Marsman* v. *Commissioner*, 205 F. 2d 335, certiorari denied 348 U.S. 943, *Economy Savings & Loan Co.* v. *Commissioner*, 158 F. 2d 472, and *John C. Lee*, 6 B.T.A. 1005, are on their respective facts distinguishable. The cited cases, although sound in their circumstances, do not override the evidence of intent that we find in the tax convention with France, namely, that a prerequisite factor of the allowable exemption of royalties from the United States tax "is indivisible in application." *Commissioner* v. *Samann, supra* at 464.

We turn now to the final question whether petitioner had a "permanent establishment" in the United States during the period January 1

through March 19, 1955. Article III(a) of the protocol to the convention with France and the regulations of the respondent thereunder, sec. 514.104, define "permanent establishment" as including a workshop, an office, or other fixed place of business, and imply the active conduct of a trade or business at such "permanent establishment." Cf. *Inez De Amodio*, 34 T.C. 894, 908, affd. 299 F. 2d 623 (dealing with the same point under the Swiss tax convention). Petitioner's argument, although confusing and perplexing, is in effect that he "was not engaged in an industrial or commercial enterprise" in the early part of 1955 in the United States, and that "where there is no industrial or commercial venture, there can be no permanent establishment" within the meaning of article 7 of the convention. He then contends that he did not have a permanent establishment here in the period in question in 1955 because that term in article 7 does not mean "residence" (his house), and it is not the same as "fixed center of activity" (a term appearing in another part of the convention, art. 10, dealing with income from the exercise of a liberal profession). Petitioner's argument is a strained one, and it appears that the complexity thereof is due to a dilemma in which petitioner is caught: He has taken the position (on his 1955 return) that he was engaged in a business here in the early part of 1955, and that part of his residence in Connecticut was set aside as his office where he carried on his business, in connection with all of which he took deductions for depreciation of the part of his residence that he used for an office, and deductions for general business expenses. In this case, petitioner has not departed from the position taken on his 1955 return, and having thus committed himself, he has resorted to a finely spun series of contentions which are patently an exercise in avoiding and overcoming the position taken on his return. Upon due consideration, we do not find any merit in petitioner's contentions under this question.

It scarcely needs to be said that the income in issue is that of U.S. source royalties for the use of copyrighted literary works under article 7 and that article 10 of the convention is not involved directly or indirectly, which is set forth below.[7] Although the royalties were for the use of copyrights covering petitioner's literary works, which he first produced through his creative writing, the income which respondent has determined is taxable is not per se compensation paid to petitioner for his personal services in performing the writing and composing tasks; the income in question is not in the same class as wages, salaries, or fees for services. Section 514.111(b), T.D. 5499, *supra*, respondent's regulation under article 10 of the convention, states:

---

[7] Art. 10: Income from the exercise of a liberal profession shall be taxable only in the State in which the professional activity is exercised.

There is the exercise of a liberal profession in one of the two contracting States only when the professional activity has a fixed center in that country.

Article 10 provides a special rule of taxation with respect to professional fees constituting income derived from sources within the United States by a resident of France who is a nonresident alien. * * * Under such rule, such nonresident alien rendering professional services, such as medical, legal, engineering, and scientific services, is not subject to United States tax with respect to such compensation unless he has an office or other fixed place situated in the United States during the taxable year.

Petitioner is not helped by his references to article 10 which is inapplicable either directly or by analogy.

Also, the issue does not involve "industrial and commercial profits." Article 3 of the convention specifies that the above class of income does not include royalties for the use of, or for the privilege of using, patents, copyrights, and other like property. In the respondent's general regulations under the convention, section 514.104(v)(4) states, in part:

(4) The term "industrial and commercial profits" means the profits arising from the industrial, mercantile, manufacturing, or like activities of a French enterprise as defined in this section. Such term does not include income from * * * royalties, * * * or compensation for labor or personal services.

Petitioner argues that "an author is not taxable on his royalty income unless he also has a commercial establishment in this country [the United States]." Our consideration of this argument follows, but the above reference to article 3 of the convention is made now so that it will be clear that petitioner's use of the term "commercial establishment" will not be confused with the term in article 3 "industrial and commercial profits."

The dispute here would appear to require resorting to the definition of "permanent establishment" in article III(a) of the protocol to the convention where the definition includes "workshops," "other offices," and "other fixed places of business," which are the only relevant categories. (See fn. 3 for the treaty definition of permanent establishment.) The narrow question is whether the part of petitioner's home at Shadow Rock Farm, which he treated for tax purposes on his 1955 return, in Schedule C-1, as the place where he conducted his business (the business of being an author), constituted a "permanent establishment"; was it a workshop, office, or fixed place of business within the treaty definition? We direct our attention first to this specific question. Under this question, the petitioner had the burden of proving that he did not have a workshop, office, or other fixed place of business in the United States during the period January 1 through March 19, 1955, within the meaning of the definition of permanent establishment in article III(a) of the protocol. Our conclusion is that the evidence shows that he had an office and fixed place of business here during part of 1955, and that petitioner has failed to establish that such office was not a permanent establishment within the meaning of that term in article 7.

Petitioner converted part of his house at Shadow Rock Farm to the use of an office. He reported on his 1955 return that 50 percent of this property was used for his business and took depreciation on that basis; and that furniture and fixtures acquired in 1954 were devoted 100 percent to business use, and he took depreciation on that basis. Respondent has not questioned those deductions and petitioner still adheres to them. He purchased the Shadow Rock Farm property in November 1950. According to Schedule C–1 in his 1955 return, he had taken depreciation deductions on part of his house for 4 years prior to 1955 in the total sum of $10,765.41, which indicates that he began in 1951, for income tax purposes, to treat the use of part of his house as a conversion to business uses. Lacking evidence to the contrary, the inference and conclusion are that petitioner used part of his house for business purposes, hence as an office, for 4 years prior to 1955 and that such use continued in 1955 to March 19. Other evidence from which such inference may be drawn consists of business correspondence and contracts with his publishers in which his address is both Shadow Rock Farm and Lakeville, Conn. The fact that petitioner regarded 50 percent of the use of his house as devoted to his business is significant. He did not introduce evidence to explain the meaning of his classification of 50 percent of his residence as devoted to business use, or to negate the inference that such use constituted maintaining an office and fixed place of business. It is well settled that where a taxpayer uses property partly for personal use and partly for business use, he is entitled to deduct the depreciation that is properly allocable to the part devoted to business use. Persons in various kinds of business endeavors often maintain offices at their residences and it has been the respondent's practice to allow deductions related thereto, provided there has been a bona fide use of such facilities in the taxpayer's trade or business. Even where such an office has served both a personal and business use it has been customary to make an allocation so that deduction is allowable for the portion properly attributable to business use. See dissenting opinion of Judge Raum in *Harold H. Davis*, 38 T.C. 175; 187–188 (vacated and remanded by agreement of the parties on appeal to the Court of Appeals for the Ninth Circuit). There is nothing in the treaty definition of "permanent establishment," insofar as it includes an "office," which would serve to exclude from the term "office" an office at the taxpayer's residence, provided it was devoted to petitioner's business. We are unable to find any merit in petitioner's contention that the office at petitioner's residence cannot be regarded as his "permanent establishment" in the United States within the treaty definition of that term and its meaning in article 7.

The treaty definition of "permanent establishment" is a fairly broad and inclusive one in which there is the catchall term "and other fixed

place of business." The term "business" has a broad meaning, which has been defined as including "that which occupies the time, attention, and labor of men for the purpose of livelihood or profit." *Flint* v. *Stone Tracy Co.*, 220 U.S. 107, 171. It is also true that whether an occupation constitutes a trade or business must be decided on the facts in each case, *Frederick A. Purdy*, 12 T.C. 888, and the intent of the taxpayer has a material bearing on the issue, although it is not conclusive, *Morton* v. *Commissioner*, 174 F. 2d 302, certiorari denied 338 U.S. 828. The determination of whether the activities of a taxpayer constitute the carrying on of a trade or business requires an examination of all of the facts in each case. *Higgins* v. *Commissioner*, 312 U.S. 212. Whether or not a taxpayer engages in activities for the purpose of obtaining a livelihood is significant. *Thatcher* v. *Lowe*, 288 F. 994; *Doggett* v. *Burnet*, 65 F. 2d 191; and *Commissioner* v. *Field*, 67 F. 2d 876, affirming 26 B.T.A. 116. Other factors to be given much weight are the exertion of some measure of continuity of effort to promote the taxpayer's business interests, *Beach* v. *Shaughnessy*, 126 F. Supp. 771, the number of transactions entered into and the gross amount of business done, *Leigh Carroll*, 20 B.T.A. 1029. The term "trade or business" is not limited to the carrying on of ordinary industrial or commercial activities, but it includes the professions, the arts, and the holding of public office. 4 Mertens, Law of Federal Income Taxation, sec. 25.08, p. 22; *Lou Levy*, 30 T.C. 1315. In *Kerns Wright*, 31 T.C. 1264, 1267, affirmed per curiam 274 F. 2d 883, we observed, in effect, that where a taxpayer has the intent and makes the effort to engage in writing, with some continuity, for the purpose of producing income and a livelihood, his writing activities can qualify as a trade or business. Continuous or repeated activity in the literary field, coupled with a reasonable expectation of making a profit, is convincing evidence of an intent to engage in writing as a business or profession. Cf. *Kerns Wright, supra* at 1267. In *Fahs* v. *Crawford*, 161 F. 2d 315, it is said: "Carrying on a business * * * implies an occupational undertaking to which one habitually devotes time, attention, or effort with substantial regularity." See also *Doggett* v. *Burnet, supra*, which stands for the principle that, in general, activities engaged in with the hope and expectation of making a profit constitute a trade or business.

In view of the evidence in this case, it seems unnecessary to set forth the above observations about certain general principles. In fact, petitioner took the position in his 1955 return that he was engaged in a business during part of 1955, in the United States, as an author. He reported on Schedule C, income from his business in excess of $40,000, and he took "business deductions" in excess of $12,000 for wages, depreciation, legal and accounting fees ($1,484), business entertainment, publicity photographs, auto expenses, 50 percent of the utilities at his

house, 50 percent of building maintenance, stationery and printing, and postage; and he also included a U.S. self-employment tax of $126. The evidence indicates that petitioner's general occupation and business activities as a professional author had been carried on in the United States for several years before 1955, and that what he did in the period January 1 to March 19, 1955, was a continuation of the same activities which previously had been carried on with regularity and continuity for the purpose of producing a livelihood, income, and profits. Although petitioner's testimony is rather limited, having been taken in deposition form in Paris, France, in response to written interrogatories and cross-interrogatories, his testimony shows that he wrote stories and novels for publication, for the purpose of obtaining income and profits, and that his income from royalties received from U.S. publishers and from the sale of motion-picture rights in his literary works was substantial in each of the years 1952 through 1954. Moreover, there are in evidence items of business correspondence with Doubleday and contracts with publishers which indicate that petitioner did much more than just think out plots and write stories in the whole process of earning royalties through granting publication and reproduction rights. Petitioner was concerned about proper translations of his works into English, the skill of translators engaged by the publisher and their charges, condensations of his stories for magazine publication, and innumerable tasks to be performed by himself in connection with his publisher's procedures in handling and preparing his "manuscripts" for publication. Petitioner's contracts with his publishers, which are detailed and long, contain reservations, and requirements that the publisher must consult the author about various matters. Petitioner retained various rights relating to other media of reproduction of his stories than publication, such as cinema rights, and television and dramatic rights. In other words, petitioner promoted the sale of his various rights in addition to his work as a writer. His literary properties were, like merchandise (however commercial the comparison is), for sale in all forms, and the market in which his interests in his literary works was sold was a wide one, which included many more prospective buyers than just the publishers of books, such as Doubleday, Appleton, and Prentice-Hall. The evidence indicates that petitioner was concerned with and participated in publicity about himself, as a successful author, and about his works, and the promotion aspects of selling to others his various rights in the products of his highly skilled and talented efforts. All of these facets of petitioner's activities as an author represented his carrying on of a business. It is understood that petitioner's literary works are widely recognized as having a high degree of literary value. But the whole activity of marketing them was nevertheless a commercial activity. Petitioner has not estab-

lished the negative proposition that he did no more than seclude himself in the ivory tower of his house in Connecticut writing out plots and typing manuscripts, completely detached and disassociated from the crass and practical activities of dealing in the business matters incident to the circulation, purchase, and production of his stories; and the evidence establishes that he engaged in carrying on business activities. As for the period in issue, January 1 to March 19, 1955, the evidence shows that petitioner negotiated and entered into a new contract, with Doubleday, before departing from the United States. We are unable to accept as reasonable or realistic petitioner's argument that his activities as an author were confined and limited to making up an outline of a story and then retiring to his office in his home to typewrite his story, and were restricted to "the act of creativity which produces masterpieces of literature"; and that petitioner's "workshop is wherever he happens to be."

How, then, is all of this related to the issue of whether petitioner had a "permanent establishment" in the United States with respect to article 7 of the tax convention with France? The issue is whether U.S. source royalties derived from contracts executed by petitioner with others are taxable by the United States or exempt from our income tax. Royalties do not spring, full-fledged, from a pen or typewriter, like Athena from the brow of Zeus (although many writers wish that they would). Royalties grow out of contracts; the contracts result from negotiations and are business and commercial agreements; the amount of the royalties results from sales. The royalties in issue are, therefore, a type of commercial profits. Article 3(d) of the convention with France provides that royalties are a kind of income that is dealt with separately in article 7, and "shall be taxed separately or together with industrial and commercial profits." In article 7, "permanent establishment" is defined broadly to include several kinds of "fixed places of business." In the United States, petitioner had an office and he engaged in a business, both, for several years up to March 19 or 20, 1955. Upon the record in this case, we are not able to conclude that petitioner's office in his house was not his fixed place of business, prior to 1955 and up to March 19 or 20, 1955, when he departed. Petitioner may have been able to, and probably did, develop plots for his stories while sitting out in a park or driving through the country, all of which is immaterial under the particular question. And he probably did part of his business negotiations in the office of a prospective publisher or producer. On the other hand, it appears that it was ordinary, necessary, and appropriate in relation to his author-business for him to have a fixed place of business, in view of the regularity, continuity, and extent of his business activities as an author who wrote for profit, undertook to sell rights in his literary

products, and maintained more or less continuous contacts with his publisher, publishers, and others with whom he transacted his author-business. See and compare *Blackmer* v. *Commissioner*, 70 F. 2d 255; *Jan Casimir Lewenhaupt*, 20 T.C. 151, 163, affirmed per curiam 221 F. 2d 227; *Pinchot* v. *Commissioner*, 113 F. 2d 718; and the dissenting opinion in *Harold H. Davis*, *supra* at 186–188. The evidence, considered as a whole, establishes, in our opinion, that petitioner's office at his house was his fixed place of business where he carried on a substantial part of his author-business activities; that his maintenance and use of that office was proximately related to his author-business; and that his office therefore was a "permanent establishment" of his in the United States within the treaty definition of and meaning in article 7 of that term. We are neither persuaded nor convinced to the contrary by petitioner's arguments, and we are obliged to note that petitioner failed to prove the negative proposition, that the office in his house was *not* his fixed place of business and "permanent establishment" within the meaning and intent of article 7, which was part of his burden of proof.

It is held that petitioner had a "permanent establishment" in the United States during the period January 1 through March 19, 1955. Petitioner's U.S. source royalties received during the whole calendar and taxable year of 1955 are subject to the U.S. income tax, and no part thereof is exempt from our tax under article 7 of the convention. Respondent's determination is sustained.

In respondent's regulations under the convention, in section 514.109 under article 7, T.D. 5499, *supra*, an illustration is given, to which petitioner refers. All of section 514.109 of the general regulations under the convention has been set forth fully hereinbefore; for convenience, the portion to which petitioner refers is again set forth in the margin.[8] It is sufficient to state that consideration has been given to this particular argument of petitioner, and that this part of the regulation is not helpful to petitioner for reasons already set forth. The question is whether petitioner had a "permanent establishment within the United States *at any time* during the taxable year," namely, January 1 to March 19, 1955. During that period, petitioner was an alien resident of the United States, not of France, and, as has been concluded, he had a "permanent establishment" here which he maintained and used in connection with his business as an author.

*Decision will be entered for the respondent.*

---

[8] * * * Thus, a nonresident alien who is a resident of France, rendering personal services within the United States, is not subject to tax with respect to such royalties even though he is engaged in trade or business in the United States by reason of rendition of such services *so long as he has no permanent establishment in the United States.* [Emphasis supplied.]